**NORVELL SERVICE COMPANY,**
Appellant,

v.

**Fullman C. SPELL et al., Appellees.**

No. 5053.

Court of Civil Appeals of Texas.
Beaumont.

Feb. 3, 1955.

Rehearing Denied Jan. 18, 1956.

On Appellant's Motion for Rehearing

Feb. 8, 1956.

Appellee's Second Motion for Rehearing
Overruled March 14, 1956.

Keith, Mehaffy & McNicholas, Beaumont, Leachman, Gardere, Akin & Porter, Dallas, for appellant.

Adams, Browne & Sample, Marcus & Weller, Beaumont, for appellees.

WALKER, Justice.

This action is for damages, for personal injuries received on July 17, 1951, by the plaintiff, Fullman C. Spell, in a collision between a truck driven by him and a passenger automobile driven by the defendant Burt Stone. The cause has been tried twice before but the record shows nothing about what happened at these trials except that certain persons did not testify. At the trial now under review the jury found that the collision was caused by Stone's negligence. Stone was an employee of the defendant Norvell Service Company and the jury found that at the time of the collision Stone was operating his vehicle in the course of his employment with said defendant. The jury assessed certain damages of Spell at $35,000. On this verdict

and on a stipulation concerning other items of damages, the trial court rendered judgment in behalf of plaintiff against both defendants for $37,113.14, and apportioned a part of this recovery to a workmen's compensation insurer which had intervened. The defendant Norvell Service Company has appealed from this judgment.

Points 1 and 2 attack the sufficiency of the evidence to support the finding that at the time of the collision Stone was operating his automobile in the course of his employment for Norvell Service Company. The plaintiff has made some question about the effect to be given these points; but this involves the intention of the appellant, and to determine this intention, we read these points together and, having done so, we construe them as meaning that Point 1 assigns the question of law, whether there is any evidence to support this finding, and that Point 2 invokes this court's jurisdiction to determine the sufficiency of the evidence as a matter of fact. The testimony relevant to the question, whether Stone was operating his automobile in the course of his employment, may be summarized as follows:

The defendant Norvell Service Company reworked oil wells for other persons and for this purpose operated several drilling rigs which it owned. One of these rigs was in operation near Gilchrist when the collision occurred and, according to Stone, it had been operating there for about three months before that date. During this period, defendant Stone was an employee of Norvell Service Company, and was one of the crew working this rig.

The evidence does not show what other operation Norvell Service Company was conducting or where the same was situated.

Stone was married and had several children and his family resided near Fannett. The distance between his home and his place of work at the rig was about 40 miles, and the highway on which the collision in suit occurred was the only road by which Stone could go to and fro between his place of work and his home.

On the day before the collision, Stone left his place of work and went to his home, using for his transportation an automobile which he drove himself. He stayed at home with his family until he had eaten lunch on the day following. Then he left his home, driving the same automobile and riding alone, and proceeded toward his place of work. He first came to the town of Hamshire and there had a transaction with a merchant named Rollins. Stone said that he bought some tobacco. Rollins said that he loaned Stone $5 for expenses but did not remember whether Stone bought anything. Stone next came to the town of Winnie, and there, at Syphrett's automobile service station, he bought a tire and a tube for the tire and had the tire mounted on his automobile. The collision in suit occurred after he left Winnie and when he was still about 15 miles from the rig.

The price of the tire and tube which he bought from Syphrett he charged to the account of his employer.

There is a conflict in the testimony (all of it from witnesses for appellant's employer) about the cause of Stone's leaving his place of work and his reason for returning to it at the time he did. Stone and Brice, the superintendent, said that the work at the rig had come to a temporary halt while a cement plug in the well hardened. Twenty-four hours was required for this. Stone's presence during this period was not necessary and he took advantage of the cessation of work to go home. His purpose, according to his testimony and that of superintendent Brice, was to visit his family and to get some clean clothes. The plug was to be drilled at 6 P.M. on the day when the collision occurred and it was Stone's duty, and he intended to be at the rig at that time in order to participate in that work.

On the other hand Evans said that he was one of the drillers at this rig and that his period of work ended at 3:00 o'clock on the afternoon of the day of the collision, but that he had left a few minutes earlier; that one J. A. Brice had relieved him as driller; and that when he, Evans, left the rig it was running. He said that he had been running the rig, that the rig had been running until he left, and that the crew had been "working the well over", and that Brice stepped in his place and went on the job. Concerning Stone, he said that superintendent Brice had relieved Stone so that Stone could go home and clean up, that Stone was returning to take up the performance of his duties, and that Stone was supposed to be back there that afternoon. Rollins testified that Stone had told him during the transaction at Hamshire that Brice had relieved him, and after first testifying that Stone had stated that he was returning to relieve Brice, Rollins said that he was not sure and also that he had assumed this from Stone's statement that Brice had relieved Stone. He also testified that Stone told him that he, Stone, was going back to the job.

Stone said that during the three months he had been with the rig at Gilchrist he had gone home when he could.

Stone had no mission to perform for his employer on his trip home and his employer did not communicate with him between the time he left the rig and the time of the collision. Stone carried no thing and transported no person in the car for his employer on this trip and, putting aside for the moment the purchase of the tire, there is no affirmative testimony that Stone undertook to do anything for his employer on this trip. If the testimony about Stone's purpose in leaving the rig is not believed, his object and his relation to his employer's work must be deduced from circumstances.

The automobile which Stone drove belonged to him. It was a two-door passenger sedan, of Chevrolet make.

The testimony concerning the title of Stone's position of employment and the nature of his duties is in conflict, but there was testimony which authorized the jury to find that, as a term of his contract of employment, Stone was required to keep his automobile with him at the rig so that he might use it to fetch small parts or tools which were needed for the operation of the rig; and also to bring personnel to the rig,

and it was proved that Stone had used his automobile for this purpose whenever this was necessary. When he did use the automobile for such purposes, he kept a record of his expenses and his employer, pursuant to agreement, reimbursed him for these. Stone's purchase of the tire and tube on the day of the collision was explained as an incident of his having carried a person in his automobile for appellant employer. Stone said that he had gone to Winnie to get a man for Norvell, that the trip was made four or five days before the collision and that a tire had blown out while he was making this trip; and both he and Norvell, President of Norvell Service Company, said that he, Stone, had asked Norvell to replace it and that Norvell had authorized him to do so by purchase at Syphrett's station. Stone said that he charged the cost of the tire and tube to his employer's account by virtue of this authority. It seems a necessary inference from the circumstances that the tire became Stone's property.

Norvell said that when Stone requested authority to replace the tire, he said that he had no spare tire.

However, it does not appear that anybody other than Stone ever drove or exercised control over the automobile or had a right to do that. There is no testimony that the employer was a lessee or a bailee of the automobile, or that anybody considered the automobile to be a part of the employer's equipment. As we construe the testimony the automobile was a part of Stone's equipment, not of his employer's.

The Norvell Service Company agreed to pay and did pay none of the costs of operating the automobile except those incurred on a mission in said Company's behalf. Under the agreement for reimbursement of Stone, all other costs of operation were to be paid by Stone from his own funds.

Stone had to stay with the rig at Gilchrist while it was operating, unless he was relieved or away on a mission, and while with the rig was subject to call whenever his services were needed, throughout the twenty four hours of the day. In order that he might be available in this way, the appellant employer provided him with living quarters in an automobile trailer, and during the time he had been with this rig at Gilchrist he had lived in this trailer except on the occasions when he was released from duty. It may be inferred that his holidays came at irregular intervals. The jury were authorized to find that an employee such as Stone was necessary to the continuous operation of the rig and that if Stone was relieved from duty somebody else had to take his place. However, there is no evidence that Stone, himself, had any unique ability (he said he had done hard labor all his life) and the description of his duties does not indicate that these duties required unique or special qualifications. In fact, the duty most emphasized in the testimony is one to fetch tools and parts of machinery.

Stone's testimony shows that if he had received an order from his employer while he was with his family or on his way home or while returning to his work he would have obeyed it.

Norvell Service Company did not provide its employees with transportation between their homes and the rig at Gilchrist. Norvell said that the employees were required to provide this for themselves. Brice, the superintendent, gave testimony about Stone which corroborated Norvell and Stone's testimony corroborated Norvell. We have mentioned Stone's testimony that he paid the expense of his journey home and of his return to his place of work. Evans testified he lived at Fannett and that he was returning to his home in his own automobile on the day of the collision.

Finally, Stone testified that he had collected compensation benefits, claiming to be on duty for the appellant employer at the time of the collision. This testimony was admitted solely to impeach Stone, who had testified that he was not on duty at that time.

### Opinion

Point 1 will be first considered. The charge defines the term "acting within the course of his employment", but we have

to apply this definition according to decisions which apply its elements and we will, therefore, refer in our discussion to decisions instead of to the definition. In International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, at page 520, 17 S.W. 1039, 1040, the court said of the servant's act that for it to make the master liable "It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed." For examples of the way in which this rule has been applied see: Galveston, H. & S. A. R. Co. v. Currie, 100 Tex. 136, 96 S.W. 1073, 10 L.R.A.,N.S., 367; J. C. Penney Co. v. Oberpriller, 141 Tex. 128, 170 S.W.2d 607. This rule makes material the purpose Stone had in driving his automobile at the time of the collision; and we will first determine the effect to be given the evidence if all of it is considered and the testimony about Stone's purpose is not rejected.

Stone's purpose in leaving the rig, as the testimony describes it, was wholly his own, for his own benefit, whether the statement of that purpose by Stone and Brice or the statement by Evans be true. Stone either went home to visit his family and to get some clean clothes or else went home to clean up. He was in his own car, paying his own way and expecting to begin work at the rig at a definite time, and he had no notion that he was performing any service for his employer. Although either purpose would, under the circumstances, have a bearing upon the efficiency with which Stone performed his work for his employer, neither would be, in contemplation of law, in furtherance of the master's business and to accomplish the object for which the servant was employed. This matter was not mentioned in P. F. Collier & Son Distributing Corp. v. Drinkwater, 4 Cir., 81 F.2d 200, but the facts of that case imply it. And see: Gewanski v. Ellsworth, 166 Wis. 250, 164 N.W. 996. Stone's return to his work was but a part of, or an incident of, his personal mission, so the fact that the collision occurred on his return to work is not material. Van Cleave v. Walker, Tex.Civ.App., 210 S.W. 767; Bres-

nan v. Republic Supply Co., Tex.Civ.App., 63 S.W.2d 1105; Bishop v. Farm & Home Savings & Loan Ass'n, Tex.Civ.App., 75 S.W.2d 285. The very considerable distance between Stone's home and his place of work is also not material in view of the testimony that employees provided their own transportation between home and work and that Stone's employer provided him with living quarters at the rig. The usual rule will be applied. See: Antilley v. Jennings, Tex.Civ.App., 183 S.W.2d 982; Yorkshire Indemnity Co. v. Gonzales, 5 Cir., 210 F.2d 545.

The plaintiff's argument stresses certain elements of the testimony. (a) Plaintiff says that Stone was subject to call throughout the 24 hours of the day, and would have obeyed an order had his employer given him one. However, there is no testimony that Stone was on duty in the sense that he expected to be called or that he was holding himself in readiness to respond to a call to perform some act for his employer. The testimony is to the contrary. As we have stated, the testimony is that Stone expected to begin work at a definite time and had nothing to do for the employer until then. In Thompson v. Twin City Lumber & Shingle Co., Tex.Civ.App., 220 S.W.2d 539, at page 541, the court gave no weight to the fact that the servant "would have stopped on the road home and talked about a proposal to sell timber to the company if some one should have hailed him down". And see: McLamb v. Beasley, 218 N.C. 308, 11 S.E.2d 283, at page 285.

(b) Plaintiff says that Stone was required to and did use the automobile in his work and that he was taking the automobile back to the place where, or in connection with the work at which, it would be used. However, the automobile belonged to Stone and as we construe the testimony it was a part of his own equipment, not of the employer's. Even if it had belonged to the employer or, by virtue of contract, had been equipment which the employer had the right to control and to use independently of Stone, the use which Stone was making of the vehicle would still, under the testimony, have been for Stone's private

convenience, to accomplish a personal object of his own. The case would be one of the employer loaning his vehicle to the servant, to accommodate and assist the servant. See: Thannisch Chevrolet Co. v. Kline, Tex.Civ.App., 134 S.W.2d 433, at page 435 (Headnote 4).

(c) Plaintiff says that the employer had control over the automobile at the time of the collision because said employer had contracted with Stone for the use of the vehicle. The testimony shows no such contract as plaintiff seems to contend for, but the comments just made apply to this argument.

(d) Plaintiff says that the employer instructed Stone to buy the tire and that the purchase of this tire, which provided equipment for a vehicle to be used in the employer's work, was an object of the trip. This argument invokes the rule making the master liable where the servant acts with mixed motives. See: Galveston, H. & S. A. R. Co. v. Currie, 100 Tex. 136, at page 143, 96 S.W. 1073, 1074, 10 L.R.A.,N.S., 367. It may be added in support of this contention, that Stone was authorized to buy the tire when he could and that Norvell, president of the appellant corporation, said that Stone told him that he, Stone, had no spare tire. Stone's conduct in having the new tire put on a wheel of his automobile could be accounted for by the lack of a spare, and if one of his tires had been destroyed a few days earlier, he probably would have had no spare. At any rate, Stone plainly had some need for the tire, and if he was to be able to use his automobile for his employer when necessary, he had to have it equipped with safe tires. It is reasonable, then, and the jury were authorized to find, that Stone, who had gotten authority to buy the tire only a few days before he did buy it, kept his authority to buy in mind and purposed to exercise it, and, since Syphrett's station was on his road, that he did have this purpose in mind when he left the rig to go home. He certainly had it in mind at some time on the trip because he carried it out by buying the tire.

However, Stone was not ordered to buy the tire as plaintiff argues. The testimony shows only that Norvell, president of the appellant corporation, *authorized* Stone to buy the tire, and that he gave Stone this authority because of the basic agreement that Stone would be reimbursed for expenses incurred in the employer's service. Further, since the tire was bought as a reimbursement, to replace one destroyed in the employer's service, and since the tire was to be put on Stone's own automobile, which he used for his own purposes as well as for his employer's, the tire would seem to have become Stone's property, as we have stated in our summary of the evidence. So, what Stone actually did when he bought the tire was some work for himself. He was only maintaining his equipment in good condition when he bought the tire; and his intention to buy the tire was for his own use and benefit in the same sense as was his intention to get some clean clothing. Therefore, the rule concerning mixed motives is not applicable. The purchase of the tire at the time it actually occurred seems fortuitous, according to the evidence which we now have under consideration.

The plaintiff makes no use of Stone's claim for compensation benefits, involving a declaration that he was on the employer's business when he was hurt, except as impeachment of Stone (and thus, of the appellant's case) and this was the purpose for which the evidence about this claim was admitted. This purpose would seem to be the only one on which such evidence would be competent.

So far we have been discussing the effect of the evidence which we have summarized above. Next to be considered is the effect of certain circumstances if some other parts of this evidence are disregarded.

Plaintiff argues that insofar as the evidence summarized proved any defense for the appellant employer, it was impeached, and that the jury were authorized to disregard any or all of it having such an effect and to believe only such parts of the evidence as they thought credible. With this argument we do not wholly agree.

Thus as impeachment, the plaintiff says, in substance, that Stone and the employer attempted to suppress evidence, and plaintiff argues further, citing Broomfield v. Texas General Indem. Co., 5 Cir., 210 F.2d 746, as authority, that inferences of fact which support the finding under attack can be based upon this conduct. However, we find no attempt to suppress. On a pretrial deposition, Stone did not give the name of Evans as a witness, but Evans came upon the scene of the collision a little after the collision happened and he apparently did not see it occur. This would afford some reason for Stone's statements on the deposition. And, Evans actually did testify and he was called by the appellant employer. As for the failure of Evans and Norvell to testify on the first two trials, to which plaintiff refers, the record does not show why, and both were called as witnesses by the employer and did testify at the trial under review. Then there are some items of evidence which are favorable to the appellant employer and which the jury had no right to disbelieve. One concerns the ownership of the automobile and another concerns the location of Stone's home. The undisputed testimony is that Stone owned the automobile and that he resided at Fannett. Plaintiff seems to accept it as proved that Stone owned the automobile, and does not specifically contest the evidence about the location of Stone's home; but had the testimony about these matters been untrue the evidence to dispute it should have been available. As regards his home, both Stone's pretrial deposition and his testimony on trial shows that he lived (that is, *still* lived) at Fannett. However, we agree with the plaintiff in part. There are material conflicts in testimony between appellant employer's witnesses, and Rollins is indirectly involved in one of these; and because of this and other reasons, including the matter of interest, we hold that the jury had a right to disbelieve the testimony of appellant's witnesses which showed that Stone had gone home on a personal mission and not on a mission for the appellant employer's benefit. Of course, the jury's right to disbelieve appellant's witnesses does not

support the finding under attack, for the plaintiff had the burden of proof as to this finding.

When the appellant employer's testimony is put aside, the evidence on which the finding under attack must depend is the following circumstances:—Stone is in an automobile, on a public highway, returning to the rig. This automobile he is obliged to use and does use in the employer's business but it is his own property. (Otherwise the ownership is a matter of inference from circumstances). At Syphrett's station, Stone buys the tire, charges the price to his employer's account, has the tire put on a wheel of the vehicle, and drives away toward the rig. This purchase was made by way of reimbursement to Stone or else it is not explained and authority to make it is not proved. Stone had no spare tire at the time of the purchase. Fifteen miles short of his destination, his automobile collides with the truck driven by the plaintiff. The rig is running all the while, and Stone is a member of the crew operating it, and it is his duty to be available at the rig when called at any time during the 24 hours of the day, unless he is absent on a mission or has been relieved. Necessity that his services be available when desired is the basis of this duty of his, and that his services might be continuously available to the rig the employer provides him with living quarters at the site of the rig. However, it is Stone's duty to fetch supplies or men when these are needed for the rig, and so he is sometimes away from the rig on a mission to procure these supplies or men. If Stone is away from the rig when it is running, it is because he is on a mission for the rig or else has been temporarily relieved from duty.

Plaintiff emphasizes some of these circumstances but wrongly. Thus, the purchase of the tire suggests a reimbursement but nothing in the circumstances listed suggests when a right to reimbursement accrued; this might as well have been before the trip on which the tire was bought as on that trip, and Stone's lack of a spare tire proves nothing here. Nor do the circumstances suggest how the purpose

to buy the tire affected the trip on which the tire was bought. Certainly these circumstances do not support an inference that the trip was made for the purpose of buying the tire. These circumstances do not show that Stone had come from the rig or, indeed, where he had come from unless he had come from his home, and not unless it first be found that Stone was on a mission for his employer can a guess be made as to show how long he had been away from the rig.

Other criticisms can be made of these circumstances. Thus, Stone could have been on a personal mission; he could have come from his home, as we have suggested, for he was between his home and his place of work when he bought the tire.

■ Stone plainly was returning to work, but it seems to us that of the circumstances listed and of all the evidence only the following tend to show that he was also returning from a mission for his employer: The rig is running. When this occurs, Stone is a member of the crew at the rig unless he is on a mission or has been relieved; and when he is on a mission he is, or at least generally is, in his automobile. Yet he does some times leave the rig while it is running, when he has a mission to perform for the rig. Opposed to this is the possibility, suggested by the location of his home, that he could have gone home on a relief. Plaintiff only had to prove Stone's agency by a preponderance of the evidence. Was it more probable that Stone was on a mission while the rig was running than that he was at home on a relief? It was, and there are some general statements of Stone which strengthen this probability. Thus he testified on pretrial deposition as follows: "Q. And you had been on that job constantly for how long a period of time? A. About three months, I guess; something like that. Q. Had you been staying in that trailer house? A. Not all the time I hadn't. Whenever I would get a chance I would go home. *Whenever they put the rig on stand-by time and the men didn't have anything to do but clean up the rig, I would go home.*" The words italicized

indicate that Stone had gone home only when the rig was idle and thus imply (a three months period of experience being involved) that he would only have done so then. Stone did not say that he had ever been relieved; evidence of relief comes from Evans and Rollins.

Our conclusion, then, is that there is some evidence which tends to prove that Stone was on a mission for his employer at the time of the collision and which, therefore, required submission of the particular issue to the jury.

Point 1 is therefore overruled. Were it not for these circumstances we would have sustained Point 1. We turn now to Point 2.

Point 2 invokes our jurisdiction to determine a question of fact, namely, whether the evidence is sufficient in fact to support the finding that Stone was operating his automobile in the course of his employment. We sustain Point 2. The evidence on which we have overruled Point 1 is very scanty. In arriving at our conclusion we have disregarded all explanations of Stone's mission and have deduced an explanation largely in terms of probabilities. Our conclusion is a very general inference and it rests, at bottom, on Evans' testimony that the rig was running. That the rig was running is the key fact, on which other elements of our conclusion depend, and the effect we have given that fact and the circumstances related to it looks somewhat like the effect given an administrative presumption. The rule of decision applicable to Point 2 is stated in Choate v. San Antonio & A. P. Ry. Co., 90 Tex. 82, at page 88, 36 S.W. 247, 37 S.W. 319, and Id., 91 Tex. 406, 44 S.W. 69, and in Re King's Estate, 150 Tex. 662, 244 S.W.2d 660. If there had been no explanation of Stone's mission we might have let the finding stand, but the circumstances on which the finding under attack must depend, in opposition to all evidence explaining Stone's mission, are so few, and the inference made therefrom is so general that we have decided that the finding attacked ought not, in justice, to stand. Plaintiff

argues that evidence concerning the nature of an employee's mission is peculiarly the property of the employee and his employer. This may or may not be true in a particular cause, but whether it is true or not the circumstance that it is has no probative force.

In sustaining Point 2 we are, of course, only adjudicating the sufficiency of the circumstances which, we have held, constituted the sole support for the particular finding against the attack made by Point 1. If we erred regarding the support for the finding against the attack made by Point 1, we cannot undertake to say whether Point 2 should be sustained or not. For the conclusion regarding Point 2 might then be affected by some rule of law which we have not applied, or applied properly.

 Appellant's other Points of Error have been considered. Points 5 and 6 are overruled. Point 3 assigns error to the admission of Stone's testimony that he had made claim for compensation for, and had collected, compensation benefits for his injuries from the collision. This testimony was admitted only for the impeachment of Stone, who had testified that he was working for appellant at the time of the collision but was not on his job until he got to Gilchrist and wasn't on duty at the time of the collision. This summary is in words used by Stone. And, stating Stone's answer in the words of the question asked him, the testimony which Point 3 assigns error to is, that Stone "did collect compensation insurance, claiming that he was an employee on duty." Stone was the appellant's witness and not merely a witness in his own behalf, and the plaintiff had the right, as against the appellant, to impeach him by proving prior inconsistent statements by him regarding his mission or concerning what he was doing on the trip in suit. Woodward-Wanger Co. v. Nelson, Tex.Civ.App., 11 S.W.2d 371. In McCoy v. Beach-Wittman Co., Tex.Civ.App., 22 S.W.2d 714, the Court of Civil Appeals said that an alleged employee's claim for compensation was admissible to impeach that person's testimony, in a suit against him

and his employer like that before us, if this evidence really did impeach the witness. On the other hand it is held that opinions or conclusions of a general sort are not admissible as impeachment to contradict statements made in testimony by the witness. McCormick & Ray's "Texas Law of Evidence", Sec. 346, p. 435. Stone's testimony that he made a claim for compensation benefits and collected such benefits is, considered alone, such an opinion or conclusion as would be inadmissible under the latter rule. However, his testimony that he had claimed to be an employee of appellant on duty at the time of the collision would show a declaration specific enough to be admissible within the holding made in Woodward-Wanger Co. v. Nelson—if what this testimony shows really was said by Stone and is not a conclusion drawn from some other statement of Stone's. The impeaching agent is Stone's own declaration. If plaintiff has proved a declaration by Stone, then plaintiff had a right to segregate and identify this statement by showing where and when it was made, for otherwise he would not have been able to contradict Stone. However, testimony that Stone's claim had been successful, resulting in the payment of compensation benefits to him, was not necessary to Stone's impeachment, and on proper objection should have been excluded. The tendency of such evidence is to show that Stone really was in the course of his employment at the time of the collision. Point 4 assigns error to the exclusion of evidence offered to explain away the effect of the testimony about Stone's claim for compensation. The evidence referred to in this point explains nothing except the actual collection of compensation benefits by Stone and could not be proper if that fact is not in evidence.

The judgment of the trial court is reversed and the cause is remanded to said court.

### Appellee's Motion for Rehearing

 We have decided that we were wrong in holding that the evidence required

submission of the issue, whether Stone was operating his automobile in the course of his employment, and that holding is withdrawn and so, in consequence, is the holding that the evidence was insufficient in fact to support the jury's finding on that issue. Our reasons are stated below, but first we will restate more completely and precisely some of the testimony which is summarized in the first part of our original opinion, especially matters referred to on page 5 thereof.

When the rig was running Stone was subject to call at the rig at any time during the twenty four hours of the day to do work.pertaining to the operation of the rig; and that he might be present at the rig whenever wanted, his employer had furnished him with living quarters in an automobile trailer which was kept at the rig. He had actually lived in this trailer while at the rig. This provision of quarters for Stone was made necessary, not only by the fact that Stone was subject to call but also by the fact that his home was distant, about forty miles from the rig, and that he had no telephone at home.

Because of the circumstances and the nature of his duties, Stone plainly did not have the right to leave the rig while it was running—unless, perchance, he had become vested with an authority to do so. We shall have to add this exception because in at least this one case Stone did go away from the rig while it was running. But the evidence does not limit this possible authority to any kind of purpose or occasion. For instance, there is no evidence that Stone had been forbidden, by special order or by rule, to leave the rig while it was running except on the employer's business, nor any that he would have been refused permission to go away except on the employer's business. Nor does it appear that authority to leave had to be conferred in any particular way or by any particular person among Stone's superior officers. All that can be said is what we have already said, that Stone did not have the right to leave the rig while it was running—unless, perchance, he had become vested with an authority.to do so; and we shall have to

assume that Stone might have acquired this authority in various ways, as when matters pertaining to the operation of the rig might require him to leave, or when someone having the right to do so permitted him to leave or sent him away on an errand. That is as definite as we can be about this matter of authority.

Further, there is no evidence that Stone had ever left the rig without authority when it was his duty to be at the rig. And the only instances of Stone's having left the rig which the evidence shows were, first, the times when he used his automobile for his employer, and second, the times when he did go home. The testimony about Stone's trips home before the one testified to in this case consists of the following part of Stone's deposition which, for convenience, is repeated from our original opinion: "Q. And you had been on that job constantly for how long a period of time? A. About three months, I guess; something like that. Q. Had you been staying in that trailer house? A. Not all the time I hadn't. Whenever I would get the chance I would go home. Whenever they put the rig on stand-by time and the men didn't have anything to do but clean up the rig, I would go home." This testimony is made indefinite by the statement that Stone went home when he got the chance, but the jury could construe the entire statement as meaning that he had had a chance to go home only when the rig was idle and that he had done so on these occasions.

There was testimony from Norvell, the president of the defendant employer corporation, that Stone was authorized to leave the rig when his services were not needed there.

We have referred, in our original opinion, to testimony by Evans, that the rig was running when he left it on the day of the collision. Evans also testified that he and his co-employees were then working twenty-four hours a day. He did not remember when Stone had left the rig, whether before or after he had come on duty that day, but his testimony implies

that the rig was running when Stone left. He said that Stone was on his way back to the rig to perform his duties and that Stone was supposed to be back there that afternoon.

The jury were authorized to find that someone had to be at hand to perform Stone's duties if the rig was to operate continuously, and that when Stone was absent from the rig while it was running, either on an errand or by other authority, somebody else had to take his place sooner or later, at least if he was to be absent for a long space of time. The evidence really does not show how long the rig could be kept running without the presence of someone to do Stone's work, or what arrangements, if any, were made when Stone was away from the rig on an errand, but the evidence about his duties would have some tendency to show how necessary his presence was and how long he might be absent without replacement. In our original opinion we referred to the conflict in the evidence regarding the nature of Stone's duties. According to Stone's deposition, he was not a tool pusher and his main duty was to fetch tools and pieces of machinery for the rig when circumstances happened to require this. Brice, he said, was a tool pusher. However, according to the testimony of Evans, Norvell and Brice, Stone was the tool pusher for the rig and although he was expected on occasion to fetch tools and pieces of machinery for the rig, this was a minor part of his duties and he had some responsibility, in the absence of a superior officer, for the continuance of the work and some directive authority. Brice, according to these last three witnesses, was the superintendent of the field operations of the defendant Norvell Service Company. On trial, Stone testified: "I stayed down at the rig to see that the work went on down there."

Of course, under the circumstances we have summarized, it was no more trouble to the employer to dispense with Stone's services at the rig in order that he might do something for himself than to dispense with him while he was running some errand for the employer.

As the summary in our original opinion shows, all of the testimony about Stone's reason for leaving the rig is that he went away in his own automobile to go to his home. The very witness on whom plaintiff must depend for evidence that the rig was running, namely, the driller Evans, said that Stone had not gone for something but had been relieved by Brice, the superintendent, and had gone home to clean up. This testimony is at page 218 of the statement of facts, and is in the following words: "Q. Do you know what time Mr. Stone had left the rig? A. I'm not sure. I believe he went in—well, I'm not sure when he went in. I know the superintendent came out and relieved him, where he could go. Q. Do you know whether or not Mr. Stone had gone for something? A. No, sir, he had gone home to clean up. Q. Were you present when he left to go home, or do you recall? A. I don't remember whether it was before I came on that morning, or what." Of course, this testimony is contradicted by that of Stone and Brice, and Brice, said by Evans to have relieved Stone, not only said that the rig was temporarily idle but also that he left the rig before Stone did. Nevertheless, it is not easy to discard the quoted statements of Evans when the plaintiff himself is basing an important contention on other statements of this very witness which are no more credible than the ones just quoted. However, we will abide by the conclusion, expressed on page 11 of our original opinion, that for various reasons the jury had the legal authority under the rule of Choate v. San Antonio & A. P. Ry. Co., 90 Tex. 82, at page 88, 36 S.W. 247, 37 S.W. 319; Id., 91 Tex. 406, 44 S.W. 69, and of In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, to disbelieve all of the testimony about Stone's mission, that is, his reason for leaving the rig; but this statement assumes that the trial court was authorized to submit the special issue under review to the jury, and all it means, and all that we meant by the statement in our original opinion, is that a jury has authority to decide an issue which the court was authorized to submit to them. Under the rule of decision referred to, a trial court

must submit an issue to the jury even though the Court of Civil Appeals would have to set aside the finding which was based on the evidence requiring the submission. If an issue has to be submitted because of this rule, the jury is charged with the duty to decide this issue and so necessarily has legal authority to accept the evidence which requires submission and to discard that in conflict with it—although on appeal the Court of Civil Appeals is bound to do precisely the opposite. Concerning all of these various matters see: Turner & Clayton, Inc., v. Shackelford, Tex.Com.App., 288 S.W. 815; Houston & T. C. Ry. Co. v. Schmidt, 61 Tex. 282; O'Fiel v. Redell, Tex.Civ.App., 298 S.W. 142, affirmed, Tex.Com.App., 6 S.W.2d 92; San Antonio & A. P. R. Co. v. Bolster, Tex.Civ.App., 51 S.W. 41. It is a peculiar rule. Well, at this point we are only undertaking to say what the jury had authority to do, not what they ought to have done, with the testimony about Stone's reason for leaving the rig, of which the statements of Evans just quoted are a part.

Nevertheless, as we have stated in the original opinion, the jury's right to disbelieve witnesses proved nothing for the plaintiff, and we still think that for the proof required of him, the plaintiff has to depend upon some circumstances left over after the aforesaid testimony about Stone's reason for leaving the rig has been discarded, just as if these circumstances and nothing else concerning Stone's reason for being absent from the rig had been proved. Discussion of these circumstances makes it necessary to repeat some things already stated, but the parties are entitled to a full expression of our views.

The first of these circumstances to be considered are the following: (a) the rig is running when the collision occurs and, according to Evans, had been running twenty-four hours a day. Further, it may be implied from Evans's testimony that the rig was running when Stone left it, although Evans did not remember when Stone left. And since we are putting aside all of the testimony about Stone's reason for leaving, what is left is merely the fact that Stone did leave the rig while it was running. (b) When the rig is running, it is Stone's duty to be at the rig unless he has authority to be absent. Evidence summarized above shows why, and there is no evidence that Stone had violated this duty. In fact, there is evidence that Stone was trusted by his employer to keep the record of his expense in operating his car for the employer. There is also evidence that Stone had a position of some responsibility at the rig. (c) At the time of the collision, Stone is in his automobile, proceeding toward the rig, and it is to be assumed that Stone also left the rig in this vehicle. Further, he had bought a tire at his employer's expense while absent from the rig, and had it put on his car, and at the time of the purchase was on his way back to the rig. However, he uses this automobile at times on his employer's business, under an agreement between them that he will do so, and the employer reimburses him for his expenses. There is a conflict in the testimony, mentioned above, as to how prominent an element of Stone's duties this use of his automobile was.

We have to determine whether Stone was acting for his employer, and so, as we have indicated, the question to be decided may be put this way, What was Stone's reason for leaving the rig? From the circumstances we have set out, the jury might have been justified in finding that since Stone did leave the rig, he had authority to do that, and (just as everybody said, including Evans) that he was returning to the rig at the time of the collision. But what was the nature of his authority? Was the authority one to do something for his employer? It certainly could have been, but at bottom there is absolutely nothing to show that it was except Stone's going away, and since the rig is running twenty-four hours a day there is no obvious and immediate connection between the rig itself and Stone's absence. For what would Stone have gone, or what would Stone have done, for the rig while the rig kept on running? On the other hand, was the authority one to do something for himself? This, too, was pos-

sible, just as much so as an errand for the employer, for Stone had means, opportunity and possible motive for such a trip. The road he traveled led to his home. Evans's inability to fix the time of Stone's departure left open the possibility of sufficient time for a. trip home, and the employer, as we have stated, could have dispensed with his services for a trip home as easily as for a trip concerning the employer's business. The possible motive for Stone's going home was the fact that he had been living down at the rig in an automobile trailer for about three months and so might well want to go home for the very reason that Evans gave, to clean up. And he was shown to have been in Hamshire, not far from the town where his own home was. We have not taken into consideration at this point Stone's testimony that he left the rig on the day before the collision, because an overnight trip away from the rig seems more consistent with his going to his home than with a mission for his employer. There is the purchase of the tire, but this is either to be referred to the agreement to reimburse, impliedly or by reason of Stone's and Norvell's testimony that it actually was, or else, on the circumstances we are now considering, it is only an isolated event which is not accounted for and which is therefore meaningless, and this would be the case if we discard the evidence of an agreement to reimburse. We get nothing out of the fact that Stone sometimes used his car for his employer; the car was his own property, and Stone also used it for his own purposes.

The circumstances only make the question, they do not answer it. The facts that an employee, trusted in a financial matter and having a position at the rig of some responsibility, not shown to have deserted his post at the rig in the past when he was supposed to be there, does get up and go away from the rig in his own automobile at a time when he would ordinarily have been under a duty to remain, may indicate that he had authority to leave, but I do not see how anybody can tell from these facts what Stone's reason was for leaving. We turn, therefore, to the following matters in addition which, as we read the evidence, complete the list of circumstances available to the plaintiff as possible support for the finding attacked. These additional circumstances are:—While the rig had been in place, before the events involved in this suit occurred, that is, during a period of about three months, Stone had left the rig on missions for his employer and he said that he had also left it, when it was idle, to go to his home. There is no evidence that he had left it during this period for any other reason.

These items suggest to us only these possibilities: The first is exemplified by Western Union Tel. Co. v. Gorman, 237 Ala. 146, 185 So. 743, where the defendant company had put in force a fixed rule of practice that its messengers wear uniforms only when on duty, and the boy who collided with the plaintiff did have on a uniform. The element of rule was also involved in Western Union Telegraph Co. v. Brown, Tex.Civ.App., 297 S.W. 267. However, as we have stated above, the evidence under review does not show that Stone had been forbidden, by special order or by rule, to leave the rig while it was running except on the employer's business, nor does it show that authority to leave would have been denied Stone except to run an errand for his employer. The evidence goes no further than to show in a general way what we already stated, namely, that when the rig is running, it is Stone's duty to be at the rig unless he is authorized to be absent. This is the only evidence which might be likened to the rules or practices considered in the two cases cited, but it is not equivalent to such rules or practices because the matter of authority is left open and undetermined. The rules or practices considered in the cases cited left nothing open. The inference from the evidence before us does not go as far as did the inference from the rules mentioned. So, decisions involving positive rules or fixed practices are not in point on the facts, although the two opinions cited do indicate the nature of the circumstantial proof which ought to be made to support, with legal certainty, a finding by a jury like that under review.

The next of the possibilities suggested by the few circumstances last mentioned is an application of the rule of decision which makes past custom and habit evidence of conduct. McCormick & Ray, in their Texas Law of Evidence, make this statement: "The habit or custom of a person in doing a particular act often has probative value in determining his conduct on an occasion in question. Of course this does not mean that everything which is loosely referred to as habit or custom is receivable in evidence. The habit or custom should be of sufficient regularity to render probable that it would be carried out in most instances. This will depend to a large extent upon the circumstances of the particular case." Sec. 684, p. 880. Were Stone's acts in leaving the rig, before the occurrence of the incidents in suit, so regular, uniform and certain in occurrence and nature within the meaning of this rule as to show that Stone followed a habit or custom of never leaving the rig while it was running except on a mission for his employer? Well, these criticisms have to be made of the evidence about these acts: First, the period of time involved is short, only about three months. Second, there is no affirmative testimony that Stone had *never* left the rig while it was running except on the employer's business; the record simply fails to show that he had and the conclusion that he had not is only an inference from rather indefinite testimony which referred to the matter of chance. Third, the evidence does not show how frequently Stone had gone on missions for his employer—such evidence seems unavailable —and such of the evidence as we have found shows that these missions occurred at irregular intervals, sometimes after long intervals, and seem to have been caused by circumstances of the moment. This evidence is the following: On deposition Stone said: "I turned in my own statement about the use of the car. Q. About what did it run per month? A. I couldn't tell you. It wouldn't make an average all the way through. Sometimes I didn't have to use it for two or three weeks." (S.F. 137.) Norvell, the defendant employer's president, said of Stone's use of the car: "I don't know how often he uses it. I don't have

any way of saying whether it was frequently or seldom. He kept track of that himself." (S.F. 226.) Fourth, the evidence does not show how frequently or at what intervals the rig had been idle, but Stone said that he had gone home when he had the chance, which indicates that chance was involved. I have kept this item in consideration because it helps the plaintiff more than the defendant. With all of these matters in mind, it seems to us that the evidence about Stone's acts in leaving the rig leave open the question, whether all of them were simply fortuitous, not amounting to a habit or custom within the meaning of the rule quoted.

We may sum up about as follows: Construing the evidence most favorably to the plaintiff and disregarding the affirmative testimony about Stone's reason for leaving the rig, the essence of all of the circumstances we have been discussing comes down to no more than this: Stone, an employee trusted by his employer in a financial matter and having a position of some responsibility at the rig, not shown to have left his post at the rig when his duty required him to be there, nevertheless does leave the rig at a time when it is running twenty-four hours a day so that he needs authority to leave, and goes away in his own automobile, but the time when he leaves and the period of time for which he is to be absent are not proved. (We have discarded the testimony of an overnight trip). There is no affirmative testimony as to what his destination was or what his reason for leaving was. During the period of about three months in which the rig had been in operation, he had made trips in this automobile for his employer and he had gone home, at least on occasions when the rig was idle, but how many and how frequent these trips were, and at what intervals these trips were taken was not proved. That Stone had authority to leave is indicated by what we have just said, but the nature and source of this authority, whether circumstances, order, or permission is not proved. Some of these matters do suggest that Stone's trip had a connection of some kind with the employer's business, although what this connection was

is not shown; the circumstances referred to are, the nature of Stone's position, the fact that the rig was running, and Stone's statement on deposition that he had gone home when the rig was on stand-by time. And this suggestion constitutes the farthest reach of the circumstantial evidence in plaintiff's favor. On the other hand, numerous other matters have to be considered with those creating this suggestion and these work against the suggestion and tend to defeat it. The gaps in the evidence and the indefinite character of evidence tend to make the suggestion of a connection between the trip and the employer's business a very general and indefinite one. If the rig kept on running, there is no obvious immediate connection between Stone's absence and the operation of the rig. And if Stone had authority to leave the rig, he plainly was not needed there and he traveled a road which led to his home. He was shown to be at a place not far from his home and he had been living in an automobile trailer, in all reasonable probability in the open air, for about three months, except for an indefinite number of trips home now and then. The question is, what was Stone's reason for leaving the rig? Was the trip for his employer or for himself? or for both his employer and himself? or for somebody else? Our conclusion is that nobody could tell, with legal certainty, what Stone's reason was. The suggestion that the trip had some connection with the employer's business appears to be, on critical examination, nothing more than the scintilla or suspicion discussed in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059. See, also: Van Landingham v. Singer Sewing Machine Co., 207 N.C. 355, 177 S.E. 126.

We see no basis for a presumption based on the collection of circumstances we have been discussing.

In consequence, we hold that there was no evidence to support the finding that at the time of the collision Stone was operating his automobile in the course of his employment, and we therefore now sustain Point 1. As we stated at the beginning of this opinion, we withdraw our holding sustaining Point 2, which invokes this court's jurisdiction to determine a question of fact. We have, in the past, decided the Point of Error assigning insufficiency in fact as well as the Point assigning no evidence, but the present case seems to be one in which Point 2 ought not to be decided except on a correct understanding of the rules of law governing the case. Of course, this situation would exist if only Point 2 had been filed, but since an appeal lies from our decision of Point 1 on which all questions of law can be determined, we have decided that we ought not to express any opinion regarding Point 2 and we do not. Of course, it may be that a particular error of law would not affect a decision of Point 2.

However, we remain of the opinion that Point 2 is sufficient to invoke this court's jurisdiction to determine a question of fact; and we hold also that it is supported by paragraph 5 of the amended motion for new trial filed by defendant Norvell Service Company. In said paragraph 5, the criticisms of the evidence following the statement that the finding is "so against the overwhelming weight and preponderance of the evidence as to be clearly wrong" are only reasons given for this statement. The words quoted are like those in Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352, at page 358, and ought to be enough to convey notice that counsel intended to raise a question of fact.

Except as modified by this opinion, holdings made on our original opinion are affirmed. Regarding the purchase of the tire see: Temple v. Stafford, 227 N.C. 630, 43 S.E.2d 845, by the Supreme Court of North Carolina; Greenwood v. Kier, Colo., 243 P.2d 417, at page 424 (Headnote 9). To repeat, the automobile being driven by Stone did belong to him. Plaintiff attacks this conclusion in his motion, but he points to no evidence that the car belonged to anybody else and he does not say who owns the car if Stone does not. We have reviewed the evidence but as we read it, no question about the ownership of the car was made at the trial; everybody who had anything to say on the subject said that the car belonged to Stone, and the parties at least acted as if the matter were not disputed. There is a

great deal of evidence other than Stone's own testimony that Stone owned the car he was driving. Thus Lewing, an attendant at the station where Stone bought the tire said that he serviced "Mr. Stone's car" and that Stone had been in the station quite a few times. (S.F. 186-187.) Evans, the driller, said, in substance, that the car belonged to Stone. (S.F. 210; 213.) Norvell, the defendant's president, said that Stone had a Chevrolet automobile which belonged to him, that is, Stone, and that Stone sometimes used this vehicle for the employer. (S.F. 226-227). Plaintiff's witnesses and the photographs in the statement of facts identify the vehicle driven by Stone as a Chevrolet. Rollins, the storekeeper, said that Stone drove his, that is, Stone's automobile up to the witness's store. (S.F. 277). A statement of Mrs. Stone's, considered with the question asked her, implies that the car was her husband's. (S.F. 282). Brice, the defendant's superintendent, said that Stone "had his own personal car there", meaning, at the rig (S.F. 284) and that he knew it belonged to Stone because Stone "owned his car before he taken the job." (S.F. 286). The appearance of the car pictured in the photographs is that of a two door Chevrolet sedan, a standard passenger vehicle, and no insignia such as one often sees no commercial vehicles is shown and none was testified to. The plaintiff made no effort to contradict this evidence, although he could easily have done so and with cogent evidence had he so desired, and it is to be noted here that the cause has been tried three times.

The motion for rehearing is overruled.

### Appellant's Motion for Rehearing

■ Appellant Norvell Service Company has filed a motion for rehearing, praying that final judgment be rendered in its favor for the reason that the cause has been tried three times, the evidence has been fully developed, and a remand would serve no useful purpose.

Our opinion on rehearing points out deficiencies in some circumstantial proof, but evidence of some details seems unavailable, as we stated in that opinion, and it is un-

likely that some other details existed which we referred to in an argumentative way, so that, on reconsideration of that opinion it seems improbable that additions to this body of circumstantial proof would be material to judgment. Evidence regarding other matters, those discussed in our original opinion, has been even more fully developed. Because of all this and the opportunity to adduce proof which the several proceedings in the trial court have given the parties, we have concluded that the evidence before us represents the substance of the proof on which the parties rely and that the appellant's motion may be, and the same is hereby granted.

It appears, too, that we have previously directed a reversal of the trial court's judgment generally, without taking account of the fact that the defendant Burt Stone did not appeal.

Therefore our former judgment is set aside and judgment is now rendered that the trial court's judgment be reversed as between the parties to the appeal, namely, the appellant Norvell Service Company and the appellees Fullman C. Spell and United States Fidelity & Guaranty Company, and that said appellees take nothing against said appellant.