Jean CONNELL and Martin W. Seidler, Trustee in Bankruptcy for Alvin L. Connell, Intervenor, Appellants

v.

Alvin L. CONNELL, Johniece Hohman and Alvin Connell Ranches, Inc., Appellees.

No. 04–93–00383–CV.

Court of Appeals of Texas, San Antonio.

Oct. 26, 1994.

Rehearing Denied Nov. 23, 1994.

William A. Frazell, Richard R. Orsinger, James D. Stewart, James D. Stewart & Associates, Inc., and Arthur J. Rossi, Jr., Law Offices of Martin W. Seidler, San Antonio, for appellants.

Carl Parkhurst, Waitz, Greer & Cennamo, P.C., San Antonio, J. Ken Nunley, Nunley & Brant, Boerne, and Lavern D. Harris, Harris & Harris, P.C., Kerrville, for appellees.

Before BUTTS, RICKHOFF and HARDBERGER, JJ.

## OPINION

BUTTS, Justice.

This is an appeal from the judgment of divorce after the trial court granted a direct-

ed verdict in favor of appellees as to "all matters [except the divorce] in this case."

Appellants bring six points of error. Both appellants, Jean Connell and the intervenor Trustee in Bankruptcy for Alvin L. Connell ("Trustee"), complain that the instructed verdict was erroneous since the evidence raised issues of fact regarding their claims. Trustee, alone, complains that the trial court improperly excluded an expert witness' testimony. Jean, alone, argues that the trial court denied her an opportunity to question the same expert witness, improperly divided the property, and improperly denied a claim for unpaid temporary support. We affirm.

### The Parties

Jean, petitioner in the divorce suit against Alvin, filed her Eighth Amended Petition to bring in additional parties claiming various theories of fraud and conspiracy. At the time of trial, Jean's claims remained against (1) Alvin, (2) Johniece Hohman, and (3) Alvin Connell Ranches, Inc. We are concerned here with only these three parties.[1]

During the suit's pendency, Alvin obtained bankruptcy relief for himself and Alvin Connell Ranches, Inc., receiving discharge in bankruptcy from numerous debts.[2] Thereafter the bankruptcy Trustee intervened in Jean's divorce action. The appellants sought to establish the value of the community estate, contending that Alvin fraudulently depleted the community estate before his discharge in bankruptcy.[3] They sought to prove that Alvin transferred community assets to his girlfriend, Johniece Hohman, and to Jack Stone and the Indian Creek Sheep & Goat Corporation, through fraud and conspiracy.

1. Jack Stone, Susan Stone, Indian Creek Sheep and Goat Co., Inc. and Wichita Falls Production Credit Association settled Jean Connell's claims against them. The son of the parties, Donald, and David Cates, an officer with the PCA, were nonsuited.

2. Alvin was discharged from bankruptcy, January 21, 1992, *before* the trial. The parties acknowledge that neither Alvin nor Alvin L. Connell Ranches, Inc. can be liable because of the bankruptcy discharge. However, Jean states that she is pursuing the claims against Alvin to

### Background

Jean and Alvin married in August 1955 and separated in May, 1985. They have four grown children. Alvin and Hohman began living together in the 1980's. Jean initially filed for divorce on June 5, 1986. The "paper value" of the community estate, as evidenced by financial statement evaluations, was approximately $3 million. Jean alleges that she dismissed the 1986 divorce suit at Alvin's request when he assured her that "business would remain the same." Alvin continued to pay Jean $1,000 per month for living expenses and also continued to manage the businesses.

The evidence established, however, that the community debts had earlier reached the sum of 1.6 million dollars. Alvin was a respected sheep and goat rancher, involved in numerous business entities. One such business, Alvin Connell Ranches, Inc., was the "family business."

Jean's testimony was that after she agreed to dismiss the 1986 divorce, Alvin intentionally embarked on a series of adventures and misdeeds to deprive her of community property.

### The Divorce Suit

Jean alleged the following:

a. Alvin and two others (Donald, their son, and David Cates) misled her and instructed her to sign documents involving Alvin Connell Ranches, Inc. at the Uvalde Production Credit Association (PCA). Jean said that she was under duress because Alvin, Donny and Cates told her that if she did not sign the papers, then she would have no money and no place to live.

fix the amount of her claim as a creditor in the bankruptcy—in the event the trustee is able to recapture community wealth.

Alvin and Alvin Connell Ranches, Inc. filed a Notice of Non–Filing of Brief with this court which states that they are not responding to appellants' brief because they have no assets and have been discharged in bankruptcy.

3. The record indicates that the Bankruptcy Court failed to find there was fraud against creditors or fraud as to any community property of the parties.

b.	The documents she signed at PCA were loan documents securing a large loan to the community. PCA had renewed the loan to the Connells over a period of many years, with the Alvin Connell Ranches property as collateral. Later PCA foreclosed on the 349 acre community property ranch. She contended that PCA agreed in advance to sell the foreclosed property at less than its value to Jack Stone, another rancher. The foreclosure eliminated a second lien held by the Small Business Association, which filed a creditor's bankruptcy claim.

c.	Alvin secretly transferred his partnership interest in the Connell–Hesse Partnership to Jack Stone.

d.	A $160,000 cash mohair government incentive then went to Stone and not to Alvin.

e.	Hohman and others participated in, and benefitted from, the allegedly fraudulent transfers.

f.	Hohman's benefits from the community estate were evidenced by her phenomenal financial success during the 1980's, during the same time the Connell's community estate depleted in value.

g.	The Trustee also believed that Alvin defrauded creditors prior to filing for bankruptcy.

Following an eleven day jury trial, the trial court granted a directed verdict in favor of appellees as to "all matters [except the divorce] in this case." The trial court then granted the divorce, divided the community estate and rendered judgment denying all other relief sought. Among the minimal assets, Jean received their house and Alvin their hunting dogs and some personal effects.

## Standards of Review for Directed Verdict

In points of error one and two, appellants argue that the trial court erred in granting the directed verdict against them. The trial judge instructed the verdict after the parties closed and after a lengthy jury charge conference.

We review the evidence in the light most favorable to the party against whom the directed verdict was rendered, and disregard all contrary evidence and inferences. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983). It is error to grant a directed verdict when the evidence raises any issue of material fact. *Garza v. Maverick Mkt., Inc.*, 768 S.W.2d 273, 276 (Tex.1989). If there is any conflicting evidence of probative value on any theory of recovery, the issue is for the jury and an instructed verdict is improper. *White*, 651 S.W.2d at 262.

During the charge conference the trial judge continued to ask counsels for Jean and the Trustee to submit specific jury instructions which must be based on facts in evidence before the jury. Jean and the intervenor Trustee had submitted requested jury charges consisting of over 70 pages. There was an objection by Hohman's counsel that the requested instructions were in "shades and degrees" of everything and not appropriate as broad form charges. The trial judge ruled:

> I have listened very carefully to your arguments on a Proposed Charge that covers many pages and has many questions.... [S]ome of these proposed Charges have covered law that is not settled. I haven't heard any facts in this matter that would justify the submission of four hundred different theories and let the jury unravel it, and then once we get their conflicting answers back, that we decide which one we want to pick out to get a judgment. Justice wasn't built that way.

> I haven't heard much evidence to justify anything except suspicion.... That's the closest you all are to anything concerning all the facts with all the people. You've got a lot of suspicion. Conspiracy can be proven by circumstantial evidence and usually is in most cases, but you cannot have it proved by unreasonable inferences or by inference piled upon inference upon inference. You have to have something of substance, not suspicion.

> \*	\*	\*	\*	\*	\*

On requiring the jury to follow his instructed verdict, the trial judge told the panel: "[T]he court is of the opinion that there is nothing as a matter of law to submit to you."

The directed verdict which does not specify the grounds upon which it was granted will be upheld if the record discloses any basis for granting it, even if that ground was not embodied in the motion for directed verdict. *Granato v. Bravo*, 498 S.W.2d 499, 502 (Tex. Civ.App.—San Antonio 1973, no writ). At the close of appellants' evidence, Hohman's counsel moved for directed verdict, stating there were only three pieces of property which were involved in the case: the Connell–Hesse partnership in which Alvin once had a 50 percent interest no longer was in the suit; the Taylor Ranch Property into which Alvin originally put $17,000, but which sum was shown to have been reimbursed to him, and he never had any further interest or participation; and the third was the head count and payment for goats and sheep bought by Johniece Hohman, shown to be her personal property, citing the testimony of Jean's own witness, Debbie McDonald, a bookkeeper, which confirmed this. The trial court did not rule at that time on Hohman's motion.

### When Trial Court May Grant Verdict On Its Own Motion

■ When based upon the evidence produced upon trial before a jury one or more parties are entitled to a verdict as a matter of law, the court, either on its own motion or upon the motion of a party, may instruct the jury as to the verdict it must return, or may withdraw the case from the jury and render judgment. 4 R. McDonald, Texas Civil Practice § 21:52 (1992). A defendant will be entitled to an instructed verdict if *either* (a) in each theory of recovery there is at least one fact proposition, constituting a component element, asserted by the plaintiff, as to which the plaintiff's evidence is so meager or the defendant's evidence is so compelling that reasonable persons could not differ as to the conclusion that such proposition is not established; or (b) each theory of recovery as to which plaintiff has raised an issue of fact on all component elements is destroyed by some affirmative defense applicable to such theory as to which the truth of every component fact proposition asserted by the defendant has been so conclusively established that reasonable minds cannot differ. *Id.*

When reasonable persons may differ as to the truth of controlling facts, a jury issue is presented. As noted in McDonald, the problem, therefore, is to determine when the evidence is sufficient to justify reasonable persons in differing. *Id.* at § 21:53. *See Gandy v. Southwestern Bell Tel. Co.*, 341 S.W.2d 554, 555 (Tex.Civ.App.—San Antonio 1960, no writ).

The trial court indulges every reasonable inference in favor of the proponent of the evidence and discards all contradictory evidence. If so viewed, the evidence amounts to more than a scintilla, i.e., more than a mere suspicion or speculation that the fact proposition might be true, then an issue is raised. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, such evidence is in legal effect no evidence, and it will not support a verdict or judgment. *Seideneck v. Cal Bayreuther Assoc.*, 451 S.W.2d 752 (Tex.1970); *Texas City Terminal Ry. v. McLemore*, 225 S.W.2d 1007, 1009 (Tex.Civ.App.—Galveston 1949, writ ref'd n.r.e.)

■ Thus, an instructed verdict is proper in two instances: when there is no evidence or when the evidence has no probative value or force. And absent probative evidence supporting the plaintiff's theory, the fact that the jury has the right to disbelieve witnesses proves nothing for the plaintiff. *See Norvell Serv. Co. v. Spell*, 288 S.W.2d 133 (Tex.Civ. App.—Beaumont 1955, writ ref'd n.r.e.).

### Directed Verdict

As previously noted, appellants argue that the trial court erred in granting the directed verdict against them. In two broad, general points of error appellants review all of the claims. It is asserted generally that the following thirteen causes of action were pleaded and proved:

a. Breach of Fiduciary Relationship/Constructive Fraud: Alvin violated his fiduciary obligations toward the community estate by the manner in which he managed the community property after Jean and he separated in 1985.

b. Fraud: Alvin conspired to defraud the community estate, and Hohman aided him in doing so.

c. Reimbursement: Alvin should reimburse the community estate for his time and effort spent enhancing Hohman's estate.

d. Waste of Assets: Alvin wasted community assets.

e. Constructive Trust: A constructive trust should be imposed on ownership interests in the following because the interests were acquired with community funds:

1) Taylor Ranch Partnership

2) unexpired leases

3) wool and mohair assets

4) 1988 feed incentive

5) Hatley & Connell accounts receivable

6) proceeds from livestock sale (March 20, 1989)

f. Resulting Trust: A resulting trust should be declared in favor of the community estate in the following:

1) Taylor Ranch Partnership

2) pipeline loan (Witt ranch)

3) value of assets in partnership (Indian Creek Ranch Co.) at time of sale to the corporation, Indian Creek Sheep and Goat Co.

g. Alter Ego and Piercing the Corporate Veil: Alvin and Alvin Connell Ranches, Inc. are the same.

h. Conspiracy: Alvin and Hohman conspired to illegally transfer assets.

i. Conversion: Alvin converted community assets without Jean's consent.

j. Fraudulent Conveyance: Alvin transferred the following property in contravention of the Uniform Fraudulent Transfer Act:

1) Chaparral Feeders, Inc. stock

2) Indian Creek Ranch Co. partnership

3) Indian Creek Sheep and Goat Co., Inc.

4) Pick-up truck

k. Destruction of Records: Alvin concealed and destroyed documents to induce Jean to dismiss the 1986 divorce suit, and then continued to destroy and alter documents to conceal fraudulent transfers.

m. Exemplary Damages: Based on Alvin's & Hohman's intent to deprive Jean of property.

n. Attorney Fees: Pursuant to the divorce and the Declaratory Judgments Act.

### Reimbursement

■ We first address the reimbursement contention. The rule of reimbursement is purely an equitable one. It obtains when the community estate in some way improves the separate estate of one of the spouses (or vice versa). "The right of reimbursement is not an interest in property or an enforceable debt, per se, but an equitable right which arises upon dissolution of the marriage through death, divorce or annulment." *Vallone v. Vallone,* 644 S.W.2d 455, 458–59 (Tex. 1982). It is a claim for money. Reimbursement would not be applicable in this case since it was shown that neither Alvin nor Jean had separate property. Nor would it be applicable to the third party, Hohman. This was properly removed from jury consideration.

### Conversion

■ To constitute conversion, there must be an illegal assumption of ownership. *See Grace v. Zimmerman,* 853 S.W.2d 92, 96 (Tex.App.—Houston [14th Dist.] 1993, no writ). There must be a demand and refusal before the person who continues to possess the property lawfully acquired and without fault may be charged with conversion. *See Hull v. Freedman,* 383 S.W.2d 236 (Tex.Civ. App.—Fort Worth 1964, no writ).

■ The court is directed to no particular proved evidence to support the allegations of conversion against Hohman or Stone and his corporation. (Stone and his corporation are no longer parties in the suit). The required elements of proof of conversion were not established either as to Alvin or Stone. In addition, both the charges of conspiracy and conversion are governed by the two year statute of limitations, which Hohman did plead as an affirmative defense. *See* TEX.

CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986). Hohman was joined as a party two or more years after the alleged incidents. The allegations of conversion as to her are based on 1985 through 1987 happenings. The trial court correctly removed the issue of conversion from the jury.

### Conspiracy

■ As to conspiracy, the two year statute of limitations, as pleaded, would apply to Hohman. *Massey v. Armco Steel Co.*, 652 S.W.2d 932 (Tex.1983) delineates the elements of civil conspiracy, all of which must be proved: (1) two or more persons (2) with an object to be accomplished (3) and with a meeting of minds on the object or course of action (4) commit one or more unlawful overt acts, and (5) there are damages as the proximate result. *Id.*, 652 S.W.2d at 934.

■ Liability is sufficiently established by proof of a concert of action or other facts and circumstances from which "the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex.1963). However, a vital fact may not be proved by unreasonable inferences from other facts and circumstances. Further, a vital fact may not be established by piling inference upon inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex.1968). There must be shown the existence of a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Id.* at 856. This was not shown.

■ There is no evidence of the elements of conspiracy in the record to show that the Uvalde PCA and Stone were co-conspirators with Alvin to defraud Jean of community assets. In that regard it is significant that no criminal investigation or charges by any governmental agency were brought against the regulated financial institution. Further, in the day-to-day operation of a financial institution which brings a foreclosure action, it is not unusual for that entity to sell the collateral to cover the debt owed. Nor is it unusual for the same entity to finance the second debt by securing it with the property as collateral, as was done here.

Highlighting the fact that the PCA had continued to renew the large loan over many years, and combining that with the (excluded) opinion of the Trustee's expert that a mythical loan officer at the PCA might have agreed to another renewal of that loan, does not constitute proof that a fraud against Jean was committed through the conspiracy of Alvin, Stone, and the PCA. An officer of the PCA testified that Alvin's and Jean's property (the Alvin Connell Ranches) had been steadily losing value since about 1980 and that the loan itself was rated as "substandard." It was indicated that the financial statements did not reflect the true financial position of the property or the Connells and had not done so for many years.

Even if other ranchers engaged in informal partnerships and business dealings with Alvin during the 1980's and even if some locals expressed a *belief* (referred to as "coffee shop talk") that Alvin and Johniece Hohman were living together and taking assets away from the community, repetition of this belief or suspicion in testimony would not constitute the required proof to establish a conspiracy to defraud. *See First Interstate Bank v. S.B.F.I., Inc.*, 830 S.W.2d 239, 249 (Tex. App.—Dallas 1992, no writ). Since there was no evidence of probative value as to theft or misapplication of fiduciary property by Alvin and Hohman or Alvin, Stone, and the PCA, this issue was correctly removed from the jury.

### Proof of Fiduciary Relationship and Constructive Fraud

■ It is established law that the relationship between a husband and wife is a fiduciary relationship, and the spouses are bound by that fiduciary duty in dealing with the community estate. It is also established law that unfairly disposing of the other spouse's community property results in the presumption of constructive fraud. A third person who knowingly participates in the breach of a fiduciary duty may also be liable.

Jean established through Robert Coleman, an accountant, that the assets transferred to Stone and the Indian Creek Sheep and Goat Company by bill of sale were either partnership or corporate property. No other personally owned assets were transferred. The only property owned individually by Jean and Alvin was the real estate which was foreclosed upon. Coleman opined there was an approximate $800,000 difference between the real value of the assets (partnership, corporate assets, and the farm) and the amount Stone actually paid. Jean urges on appeal that this was all preplanned; further, the partnership interest in Connell–Hesse was secretly transferred to Stone in 1989, and Stone subsequently benefitted by collecting the government mohair incentive. The record shows that the community estate (through Alvin) owed Stone for loans in the past. While it was shown that Alvin was involved in business undertakings with others, including Stone, the record does not disclose proof of fraudulent conveyances of community property.

Hohman's trial objection correctly pointed out that Hohman was not involved in these particular conveyances. To prove constructive fraud appellants must introduce evidence that Alvin breached a legal or equitable duty, which the law declares fraudulent because it violated a fiduciary relationship. *See Carnes v. Meador*, 533 S.W.2d 365, 370 (Tex.Civ. App.—Dallas 1975, writ ref'd n.r.e.). In the present case, unlike the facts shown in *Carnes*, only one item, such as a certificate of deposit, checking account, or gift of cash or community property fraudulently made to a third party is not claimed. *See Estate of Korzekwa v. Prudential Ins. Co.*, 669 S.W.2d 775, 777 (Tex.App.—San Antonio 1984, writ dism'd). Here the theory of constructive fraud encompasses all of the business transactions of Alvin after the parties separated.

Appellants also rely upon the Uniform Fraudulent Transfer Act. TEX.BUS. & COM.CODE ANN. § 24.005 (Vernon 1987 & Supp.1994). The Act is designed to prevent transfers of property made with the intent to defraud creditors. Ordinarily, whether the conveyance was made with intent to defraud creditors or whether the grantee had knowl-edge or notice of such intent are fact questions, but, where evidence indisputably shows that the conveyance was not so made and there is no evidence tending to connect the grantee with any intent to defraud, the issue becomes one of law. *Southwestern Paper Co. of Dallas v. Campbell*, 97 S.W.2d 520, 522 (Tex.Civ.App.—Dallas 1936, writ dism'd).

In the present case there is no evidence to show that any grantee had knowledge or notice that community property was conveyed with the intent to defraud any creditor. Since no intent to defraud was proved by Jean in her action claiming actual fraud, the statute providing that a transfer with intent to defraud is void would not apply. *See* TEX.BUS. & COM.CODE ANN. § 24.005 (Vernon 1987 & Supp.1994). Nor did the Trustee present supporting evidence of intent to defraud creditors.

Johniece Hohman had worked as a bookkeeper for her father and Alvin in their partnership, which had ended many years before. The evidence showed that she borrowed substantial amounts of money from a bank more than once and operated her own business in the 1980's. She enjoyed success while Alvin's business, and apparently his health, declined. At the time of trial, Alvin did little or no work, ostensibly was not well, and had medical bills which Hohman was paying.

One of the earlier businesses in which Alvin engaged was a "steer deal" in which Alvin participated with Stone, Hesse, and Tanksley. They were to split any profits, however, there was testimony that the deal made "nothing". It was contended by Jean that Alvin received several thousand dollars from the Connell–Hesse partnership as a "cover" for the deal. Other than surmise, no proof of that appears in the record. The evidence reflected that Stone took over some of Alvin's ventures when Alvin could not repay money owed. Apparently Alvin continued for a short time to be involved in some of those ventures, although Stone now owned them.

While it was shown that much of the paperwork by Alvin and the Alvin Connell Ranches, Inc. was not without flaws, i.e. back-dating, no meetings of the shareholders

(Jean and their son) authorizing sales, apparently this was the method by which the family business had been conducted during the entire period, including the time of its financial success. It was contended that Jean was induced to sign corporate paperwork with no explanation. While this is not approved as the proper manner in which corporate business should be conducted, there is nothing in the record to show that Jean was prevented from learning facts about the business or that facts were deliberately, with fraudulent intent, kept from her. We also note the trial court was told that Jean had abandoned her claim of duress.

It was shown that Alvin and Hohman each drove matching pickups although the corporation was defunct. Where the money to pay for them came from is not clear in the record. It was appellants' belief that the funds came from community assets. This should have been, and possibly was, brought to the Bankruptcy Court's attention if action was appropriate. It is also noteworthy that the Bankruptcy Court had jurisdiction to investigate claims of fraudulent conveyances with the intent to defraud creditors.

### Taylor Ranch Property

Rex Johnson testified that he heard about the Taylor ranch being up for lease about 1986 and he leased it in 1987. Alvin invested $15,000, and later $2,000, and Hohman contributed some goats and several thousand dollars. A loan of about $62,000 was obtained, and Johnson paid the interest on the loan. There was to be an even split of profits between the three, but no one was paid a salary. Alvin soon got the $17,000 investment out and left the other two persons in. He no longer had any interest in the Taylor ranch property, according to testimony at trial. There was no probative evidence to establish otherwise, although appellants claimed that community assets were still implicated.

In all of the transactions in which Alvin participated and which involved community property, there is no probative evidence to sustain a finding of constructive fraud against Jean's share of community property. While some of the business decisions may be

questioned in hindsight, and some even looked upon with suspicion in this case, there is no probative evidence, or there is merely a scintilla of evidence, to show Alvin acted in such a manner as to constitute a breach of fiduciary duty regarding the community interests. Further, no basis was proved upon which a constructive trust on existing property or funds held by others, such as Johnson or Hohman, could be imposed. The trial court properly withdrew the issues of constructive fraud and constructive trusts from the jury.

### Actual Fraud

Another allegation is that Alvin committed the tort of actionable fraud. It would be necessary to prove the elements of actual fraud for this tort to be submitted as an issue to the jury. *See Horlock v. Horlock,* 533 S.W.2d 52, 55 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ dism'd). Actual fraud involves dishonesty of purpose or intent to deceive. *Id.* In this case there was no proof of Alvin's intent to deceive. Not explaining legal documents or the financial statements to Jean would not constitute actual fraud. As noted earlier, it may be assumed that the Bankruptcy Court investigated any allegations or signs of fraud before granting a discharge in bankruptcy to Alvin and the Alvin Connell Ranches, Inc. Also if there were a reason to "pierce the corporate veil" to uncover fraud in these transactions, the Bankruptcy Court had that option. Since Alvin managed the family business for many years, he was, in effect, Alvin Connell Ranches, Inc. There is nothing in the evidence of Alvin's actions, either individually or as the alter ego of the corporation, establishing the elements of actual fraud, one of which is fraudulent intent. The trial court correctly removed the issue of fraud from the jury's consideration.

### Wasting Community Assets

Jean also asserted that Alvin wasted the community assets. *Falor v. Falor,* 840 S.W.2d 683 (Tex.App.—San Antonio 1992, no writ) illustrates an example of wasting community assets when the husband disposed of about $28,000 in community assets for non-

community purposes without the wife's knowledge or consent. The proof was that three days after separation, the husband disbursed community funds to relatives and a friend. Thus the wife was entitled to reimbursement, and the trial court considered the wasting actions in dividing the community property. However, there is no evidence in the present case that Alvin wasted community assets, although there is evidence that his business ventures lost money and that the Connell corporation took bankruptcy, as did Alvin. The proposed issue of waste of community assets was properly withdrawn from the jury.

## Resulting Trust

A resulting trust arises by operation of law when title to property is taken in one person's name while consideration for the acquisition is provided by another person. It must arise at the time of passage of title. An illustrative case is *Cohrs v. Scott*, 161 Tex. 111, 338 S.W.2d 127 (1960). That wife contended that the husband invested community funds in an apartment building acquired in Cohrs' name. She claimed this established a resulting trust on behalf of the community and that she was entitled to one-half interest. The trial court instructed a verdict against the claim; however, the court of appeals reversed, stating an issue of fact was raised. The supreme court reversed the appeals court and affirmed the trial court, holding that under the circumstances, there was raised no more than a surmise or suspicion.

In the present case appellants seem to be asserting that a resulting trust in favor of the community arose on all of the property affected by Alvin's business dealings after 1986. Usually the theory of a resulting trust is avowed as to a particular real estate transaction. "The trust arises out of the transaction and must arise at the time when title passes." *Cohrs v. Scott*, 338 S.W.2d at 130. Under all the circumstances, the evidence presented raises no more than a surmise or suspicion regarding any real estate title transaction. It does not arise to "some evidence" that community funds remained in the realty in this case. The trial court therefore correctly directed a verdict in this matter.

"[I]t is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'." *Rounsaville v. Bullard*, 154 Tex. 260, 276 S.W.2d 791, 794 (1955), *citing Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059, 1063 (1898). Since we have held that the evidence here amounts to no evidence or no more than a mere scintilla, it follows the trial court properly instructed the verdict.

Because of the lack of probative evidence concerning destruction of records with fraudulent intent, we have no need to discuss that subject. We have concluded the trial court, on its own motion, correctly withdrew the case from the jury's consideration and instructed a verdict. Therefore, it is not necessary to address the claims for exemplary damages and attorney fees. Points of error one and two are overruled.

## Expert Witness—Bill of Exception

In point of error three, Trustee contends the trial court erred by excluding the testimony of Phil Engelman, its financial expert witness. Engelman did testify before the jury a short time, with the trial court ruling that his testimony would not be admissible as to Hohman, but only as to Alvin. He said he reviewed Alvin's loan application with PCA and instruments given Engelman "to find out if [Alvin] was under duress or stress or would not have been able to get a loan renewed at the PCA at the time he sold and transferred assets from Alvin Connell Ranch, Inc." He examined Alvin's federal tax returns to try to determine Alvin's ability through cash flow from 1985 through 1988 to continue to pay or service a debt at the bank. The Trustee asked, "What would be the criteria the loan officer would look at in deciding whether or not they would make the loan?" Before Engelman answered, the trial court called counsel into chambers.

The trial court dismissed the witness following an off the record session in chambers.

In the intervenor Trustee's bill of exception Engelman testified as to the criteria that a loan officer would utilize in order to extend Alvin's loan. He stated his opinion was a loan officer would recommend that PCA renew the loan even though the loan had been, and still was, classified as substandard. He said the instruments showed that PCA would foreclose on the 339 acre farm and sell it to Indian Creek Sheep & Goat at a prearranged price and then would finance the acquisition. He would characterize this as a collusive foreclosure sale.

The court then questioned Engelman, who agreed the loan had been substandard since 1981, and the indebtedness owed by Alvin and Jean was $1,600,000. Further, Engelman agreed the board of directors must first approve any loan action. In addition, government examiners could object and disapprove such continued servicing of the substandard loan. The witness said he could only "go by what I reviewed," and noted he was not present at the time of the application. *See* Tex.R.App.P. 52(b).

■ The admission of evidence is a matter within the trial court's discretion. A trial court has broad discretion in deciding whether to admit expert testimony, and its decision should not be disturbed unless an abuse of discretion is shown. *See Herrera v. FMC Corp.*, 672 S.W.2d 5, 7 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

"To obtain reversal of a judgment based upon error of the trial court in admission or exclusion of evidence, the following must be shown: (1) that the trial court did in fact commit error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment." *Gee v. Liberty Mutual Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989), *citing Bridges v. City of Richardson*, 163 Tex. 292, 354 S.W.2d 366, 368 (1962); Tex.R.App.P. 81(b).

Apparently the ultimate fact issue on which the expert, Engelman, sought to offer his opinion was that fraud was committed. The record shows his actual testimony was that, in his opinion, collusive fraud was demonstrated since the PCA could have extended the substandard loan for another year but did not, and had agreed to finance the next purchaser's loan.

The questions posed to the expert by the trial court indicate its basis for excluding the evidence. Appellant Trustee has failed to meet the required test to show this was error and an abuse of discretion. The point is overruled.

### Whose Bill of Exception

■ In point of error four, Jean argues that the trial court erred when it refused to permit her to ask questions of the Trustee's expert witness, Phil Engelman, during the Trustee's bill of exception, "when intervenor passed the witness for cross-examination." The record does not reflect that the bill of exception witness was passed for cross-examination. Jean argues that she should have been permitted to show what testimony she would have elicited from Engelman before the jury.[4]

According to Tex.R.App.P. 52(b), it is the party calling the witness who makes the bill of exception of the excluded testimony. The excluded testimony was elicited by the Trustee from his own expert witness. Appellant has not cited authority which permits another party to "adopt" the bill and begin questioning another party's witness on the bill of exception proffer. Nor have we found law approving the procedure. The point is overruled.

### Property Division

In point of error five, Jean argues that the trial court abused its discretion in the property division. Jean argues that the trial court should have considered damages or assets recovered from a favorable jury verdict (which was precluded by the directed

---

4. Mr. Orsinger: Your honor, we would like to adopt the bill as well, and I'd like to ask the witness [Phil Engelman] two questions.
The Court: You adopt the bill that's not your witness?

Mr. Orsinger: Yes, we'd have an opportunity to question him also if he were called as a witness in front of the jury.
The Court: Not for the bill, sir.

verdict), and that a failure to do so was an abuse of discretion. It is argued that failure to submit the fraud issue to the jury and to be bound by the jury's answers, consider the wrongdoing and any recaptured assets in the division of the estate, and to award Jean all of the separate property component of those claims and any of the community property portion of those claims was an abuse of discretion. Appellants apparently rely upon their arguments in points of error one and two—that the trial court erred in directing the verdict—although no authorities are submitted other than recognized law on the division of community property.

Thus, if the judgment were reversed for error in directing the verdict, the case would be remanded for trial on the issues, and the court would then divide the community property "recaptured," if the jury answers were favorable. Since no error has been found in the rendition of the directed verdict, we cannot say the trial court abused its discretion in the division of community property.

### Temporary Support

■ In point of error six, Jean argues that the trial court erred by denying her claim for unpaid support which had been awarded previously in a temporary order. In a written statement to the court, Alvin declares that because he has no assets and has been discharged in bankruptcy, he will not file a brief nor appear in the appeal. However, he acknowledges that the bankruptcy discharge does not relieve him of this temporary support obligation. We agree. Therefore, since this is a valid debt which was still owing at the time of the final judgment of divorce, the judgment is modified to reflect that the temporary order remained in effect and constituted a valid debt not subject to repudiation by the trial court.

We conclude the evidence in the present case does not rise to the level of "some evidence," or it is no more than a mere surmise or scintilla without probative value. The trial court correctly withdrew the case from the jury's consideration and instructed the verdict.

The judgment is modified to reflect that the temporary support order remains in effect and constitutes a valid debt owed by Alvin and not subject to repudiation. As modified, the judgment is affirmed.