James GONZALES, Appellant,

and

Olga Willis, Appellant/Appellee,

v.

Olga WILLIS, Appellee/Appellant,

and

Tom Benson Chevrolet Company, Inc., Appellee.

No. 04–97–00949–CV.

Court of Appeals of Texas, San Antonio.

April 21, 1999.

Rehearing Overruled May 25, 1999.

Tina Torres, Rob Hughes, Jr., Law Office of Peter Torres, Jr., P.C., Jeffrey R. Davis, Osherow & Davis, P.C., Thomas H. Crofts, Jr., Ellen B. Mitchell, Crofts, Callaway & Jefferson, P.C., San Antonio, for appellant.

Humberto G. Garcia, John D. Mereness, Johnson, Curney, Garcia, Wise & Farmer, P.C., San Antonio, for appellee.

Before TOM RICKHOFF, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION ON APPELLEE'S MOTION FOR REHEARING

Opinion by: TOM RICKHOFF, Justice.

Appellee Tom Benson Chevrolet Company's motion for rehearing is granted. The prior opinions and judgment in this appeal, issued February 10, 1999, are withdrawn and the following opinion and judgment are substituted therefor.

### INTRODUCTION

Olga Willis sued James Gonzales and his employer, Tom Benson Chevrolet Company, Inc. (Benson), claiming that Gonzales made sexual advances toward her while ostensibly assisting her in obtaining a job at Benson. She asserted claims for intentional infliction of emotional distress, sexual harassment, sexual discrimination, and negligent hiring, retention, training, and supervision. At trial, she prevailed only on the intentional infliction of emotional distress claim. The court entered a judgment against Gonzales on this claim for $55,000. Gonzales appeals this portion of the judgment. Willis appeals the trial court's decision to direct a verdict on her negligence claims. Although Gonzales's behavior could be considered extreme and outrageous, Willis did not establish that she suffered severe emotional distress. We therefore reverse the portion of the judgment awarding Willis $55,000, and render judgment that she take nothing on the intentional infliction of emotional distress claim. Because Gonzales did not commit an actionable tort against Willis, her claims for negligent hiring, retention, training, and supervision are precluded as a matter of law. We therefore affirm the portion of the judgment ordering that Willis take nothing on these claims.

### FACTS

Hoping to obtain a job selling cars, Willis contacted an acquaintance who was a sales manager at Benson. He told her she should talk to James Gonzales, another Benson employee, about getting a job there. At the time of the events giving rise to this suit, Gonzales had been twice fired and twice rehired by Benson. One time he was fired for bringing a pornographic movie to work to show at a meeting of salesmen. He was also reprimanded for pinching a female co-worker's buttocks. The second time he was fired, a notation was made on his record that he was not rehireable. He was rehired anyway.

During their first meeting, Gonzales informed Willis that she could not be hired at that time because she had no experience selling cars. He suggested that she seek a job at a used car lot called E–Z Motors. After Willis secured a job at E–Z Motors, she kept in touch with Gonzales: she sub-

mitted an application and resume, informed him when she made her first sale, and sought advice regarding problems she encountered at E–Z Motors. During these conversations, Gonzales suggested that she might be able to obtain a job at Benson if Benson has an opening. One day, Gonzales invited Willis to dinner to discuss a potential job. Willis accepted the invitation, and Gonzales, driving a Benson automobile, picked her up that night at E–Z Motors. Willis testified that on the way to dinner, he commented that she had "baby legs" and asked if he could touch them. Willis said "no" and tried to change the topic of conversation. During the remainder of the drive, they discussed selling cars. They arrived at the restaurant, a barbecue place, and resumed their discussion about selling cars. Willis testified that the following exchange occurred after their dinner was served:

> So he starts getting his hands dirty [with barbecue sauce], and he say, "You know, I'm thinking about something." I said, "What are you thinking about?" He goes, "I'm thinking about, you know, my fingers are all with barbecue sauce. If you will let me stick barbecue sauce in finger—my finger in your pussy to see, you know, how it's like. And I'm sure when I'm telling you this, you're getting wet," and said, "I can see your tits getting hard," you know.
>
> And then after that, you know, "Go bring by [sic] cock in your pussy and kiss you all over and, oh, it would be a lot of fun" and all kind of stuff. And I say, "Would you please stop? You know, I don't think this is nice to tell me that."
>
> And, you know, constantly I'm trying to change conversation . . . , and so I feel uncomfortable. So I ask him, "Can you—" you know, "Can we go back?" And he goes, "Sure."

When asked whether she got up from the table at that point, she responded:

> I did not. I was embarrassed. I'm trying to keep, you know, nice with him, but I also show him that I was very,

very uncomfortable [with] what he's telling me.

Although Gonzales initially agreed to take Willis back to E–Z Motors, he nevertheless continued his sexual advances:

> He say, "Come on. You're not going to work anymore. Let's go stay and dance. I would like to close—dance with you real close. That way, I can feel your tits close to me. I want to see you. I want to feel your waist," and, you know, "Let's go stay." And I say, "No, I can't stay. I have to go work. I have long hours the next day; and besides that, they're going to close the dealer, and I will not be able to get my car out of the dealer—out of the parking lot."

Finally, after this protestation, Gonzales drove Willis back to E–Z Motors. She testified that on the way back to E–Z Motors:

> I didn't say much. I was so embarrassed. I can't remember exactly what we talked about, so—I remember when we get to the lot, he—I tell him—I tell him, "Please, you know, don't keep these conversations with me anymore." He goes, "Okay, that's fine." And that was it.

Willis described her feelings at the end of the evening as follows:

> I [felt] a little bit uncomfortable, but I'm trying . . . to do my best, you know, not to think negative about him because I was looking at him as a person that was going to help me to get a job.

Sometime after their dinner together, Gonzales called Willis, told her he had won a trip to Acapulco, and invited her along. When Willis declined the invitation, Gonzales told her, "One of my dreams if I take you to Acapulco is you—seeing you—seeing you in the shower, you know, taking a bath. I promise you I will not touch you. I will not do anything, just—but watch you there in the bathroom taking a bath." Willis informed Gonzales that she doesn't "take those trips." Undeterred, Gonzales

called her back to ask again if she would go with him and again Willis told him no.

The next time Willis saw Gonzales he stopped by the dealership where she worked and invited her to lunch with this lure: "We're going to talk about a job. I think I have something for you." Willis told him she would go if he promised that he would not "say nasty things" to her. Gonzales responded, "I promise you. It's going to be strictly about a job." Once he had Willis away from the dealership, however, he disregarded his promise:

> We ordered the food and everything, and he told me, "You know, I'll help you if you help me." He started talking nasty again about me, about his dreams about sitting on the chair dreaming about me, about getting hard, about getting wet, about—dreaming about, you know, the way I take my bath, about sticking his finger in my pussy, and swallow the finger, and touching my tits, because he always tell me that I have beautiful tits.
>
> And I say, "Do you know what? You promised me something, and you did it again. And, you know, I don't want to hear about it." . . . . He say, "I'll help you if you help me." And I say, "I don't need your help then," and I asked him to take me back.

Willis testified that her understanding of the comment, "I'll help you if you help me," was that she had to "pleasure him" in order to get a job. When he returned her to the dealership, she informed him, "not to bother me, not to call me anymore, that I don't want to hear about him anymore." In spite of this plea, Gonzales called her again to talk about her job. Willis reminded him that she had asked him not to call her anymore and then hung up on him.

Thus thwarted from having direct contact with Willis, Gonzales nevertheless managed to inject himself into her life. One day, he went to lunch with some of her co-workers. When the co-workers returned from lunch, they told Willis that Gonzales asked them to send her "a message" that he was still waiting for her to go to Acapulco with him and he was still dreaming about her.

Gonzales testified that his encounters with Willis were purely professional, and that he never made a sexual advance toward her.

When asked how Gonzales's conduct had affected her, Willis testified:

> [E]very single time I remember things like this coming back over and over, it hurts me. He made me feel, you know—
>
> And I even think about, "What did I do wrong for him to talk to me this way?" Because everybody, every single person I work for, they always respect me, any job, any position. I work between a lot of mens [sic], and I'm the only girl; and nobody talk anything nasty . . . in front of me.
>
> And when I met Mr. Gonzales—he is an older person—my education was that older people needs to be respected; and I always like to be close to older people, because the older people is the people who teach you best. And when he started talking to me, it hurts me because I didn't know what I did wrong; and I was afraid to talk to older people anymore. I'm afraid to get close to them. I'm afraid to believe in people again. I can't.

Willis further testified that when her co-workers conveyed Gonzales's "message":

> They made me feel dirty. I even got home, took a shower, crying. I mean, I cannot sleep. Every single time I go to sleep, I can listen to voices. I can listen to his voice talking nasty with me.

After the event involving her co-workers, Willis resolved to take action against Gonzales:

> That was the last thing I can took [sic], because I feel like he was making everybody lose respect for me. I work so hard for people at that particular dealer to believe in me and respect me, for him to come to them and say nasty things.

And then later on, I was afraid that somebody else was going to come to that office and say something nasty to me. And that really needs to stop.

Accordingly, Willis filed an administrative complaint against Gonzales and Benson. After receiving a "right to sue" letter from the Texas Commission on Human Rights, she brought this suit.

## GONZALES'S APPEAL

■ In *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex.1993), our supreme court adopted the tort of intentional infliction of emotional distress as set out in section 46(1) of the Second Restatement of Torts. To recover for this tort, the plaintiff must prove: 1) the defendant acted intentionally or recklessly; 2) the conduct was extreme and outrageous; 3) the defendant's actions caused the plaintiff emotional distress; and 4) the resulting emotional distress was severe. *See Twyman*, 855 S.W.2d at 621. Gonzales argues that the evidence is legally and factually insufficient to establish the first, second, and fourth elements.

■ In reviewing legal sufficiency or "no evidence" arguments, we must consider the evidence and draw all inferences in the light most favorable to the verdict. *See Southwestern Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 54 (Tex.1998). In reviewing factual sufficiency or "insufficient evidence" arguments, we must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

### 1. Extreme and Outrageous Conduct

■ To be actionable, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965). It has been noted that courts have little guidance in deciding when conduct crosses the line from the category of merely rude and offensive behavior to the category of extreme and outrageous conduct, and that the test is essentially a subjective one. *See Twyman*, 855 S.W.2d at 629 (Hecht, J., concurring and dissenting); *GTE Southwest, Inc. v. Bruce*, 956 S.W.2d 636, 646 (Tex.App.—Texarkana 1997, pet. granted). Generally, however, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " RESTATEMENT § 46 cmt. d. The extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with the victim that gives the tortfeasor actual or apparent authority over the victim, or power to affect his or her interests. *See id.* cmt. e.

■ It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *See Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993); RESTATEMENT § 46 cmt. h. But when reasonable minds could disagree, it is for the jury to determine whether, in a particular case, the conduct is sufficiently extreme and outrageous to result in liability. *See* RESTATEMENT § 46 cmt. h. After evaluating the evidence in this case, the trial judge determined that a jury question was presented on this issue and the jury decided that Gonzales's conduct was extreme and outrageous.

■ Given these considerations, our task is to determine whether particular behavior in its surrounding context, could or could not, as a matter of law, amount to extreme and outrageous conduct. The behavior at issue in this case consists of vile sexual advances that were repeated in the face of persistent and unwaivering entreaties that the perpetrator refrain from making such comments. The behavior also includes encouraging the victim's co-workers to convey indecent propositions to the victim at her place of employment. The

context in which the advances were made is also important. Clearly, Gonzales led Willis to believe that he could assist her in obtaining the job she desired at Benson. He thus acquired a position of power over her—a position he used to subject her to his lecherousness. Considering this context and the demeanor of Willis and Gonzales, the jury could infer that Gonzales chose his victim well—a victim reluctant to "make a scene," a victim who would quietly endure the indignities cast upon her for fear of angering a person in power or being humiliated by her co-workers. To hold that this behavior cannot, as a matter of law, amount to extreme and outrageous conduct would be tantamount to saying that no reasonable person, understanding the context, would exclaim, "Outrageous!" upon overhearing Gonzales's obviously unwelcome vulgarities. *See* RESTATEMENT § 46 cmt. d. At a minimum, reasonable minds could disagree regarding whether Gonzales's conduct was extreme and outrageous. Therefore, it was for the jury—the representatives of the community and the proper arbiters of what exceeds "the bounds of decency," and what is "atrocious, and utterly intolerable in a civilized community"—to decide this question. *Id.*

We recognize that some courts have held that conduct similar to Gonzales's conduct was not extreme and outrageous. *See, e.g., Wilson v. Sysco Food Servs.*, 940 F.Supp. 1003 (N.D.Tex.1996); *Gearhart v. Eye Care Ctrs.*, 888 F.Supp. 814 (S.D.Tex. 1995); *Garcia v. Andrews*, 867 S.W.2d 409 (Tex.App.—Corpus Christi 1993, no writ). Other cases have held that similar conduct was extreme and outrageous. *See, e.g., Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671 (Tex.App.—El Paso 1997, writ denied); *Bruce*, 956 S.W.2d at 647. None of these cases is binding on us; their holdings merely provide proof that the extreme and outrageous standard is somewhat amorphous.

### 2. Intent or Recklessness

■■ To be liable for intentional infliction of emotional distress, the defendant must have either intended to cause the distress or acted with reckless disregard of the risk that he would cause such distress. *See Twyman*, 855 S.W.2d at 623–24. Gonzales denied that he had any intent to cause Willis pain or make her uncomfortable or upset. Based on this testimony, he argues that the evidence is insufficient to establish intent or recklessness.

Defendants will rarely admit knowing of a substantial certainty that their conduct would cause emotional distress. *See id.* at 623. Noting this fact, the supreme court has emphasized that juries are free to discredit the defendant's protestations that no harm was intended and draw necessary inferences to establish intent. *See id.* In this case, not only did Gonzales deny any intent to hurt Willis, he denied that he even engaged in the conduct that is the subject of this action. The jury could infer intent or at least recklessness from the nature of Gonzales's statements and from Willis's requests that he refrain from making such statements.

### 3. Severe Emotional Distress

■ Emotional distress includes all highly unpleasant mental reactions, such as humiliation, embarrassment, anger, worry, and disappointment. *See Villasenor v. Villasenor*, 911 S.W.2d 411, 416 (Tex.App.—San Antonio 1995, no writ); *see also* RESTATEMENT § 46 cmt. j.

> Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.

RESTATEMENT § 46 cmt. j. Feelings of anger, depression, and humiliation are not sufficient to establish severe emotional distress. *See Villasenor*, 911 S.W.2d at 417. Furthermore, conduct is not actionable as intentional infliction of emotional distress

merely because it may damage the plaintiff's reputation. *See Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d 198, 202 (Tex.1992).

Willis testified that when Gonzales made the advances toward her she was merely "embarrassed" and "uncomfortable." She also testified that remembering what Gonzales did "hurts" her and makes her wonder what she did wrong; that his conduct has affected her ability to trust people, particularly older people; that the comments relayed by her co-workers made her feel dirty and made her cry; that she "cannot sleep," and when she goes to sleep she hears Gonzales "talking nasty" to her. Drawing all inferences in favor of Willis, the most that can be said of this testimony is that it is some evidence of a highly unpleasant emotional reaction. Willis failed to muster any evidence from which a jury could reasonably infer that her emotional distress has been *severe.* For example, there is no indication of the intensity or duration of the emotional distress. The evidence is therefore legally insufficient to establish severe emotional distress. *Cf. Gorges Foodservice, Inc. v. Huerta,* 964 S.W.2d 656, 668–69 (Tex.App.—Corpus Christi 1997, no pet.) (testimony that plaintiff's wife temporarily ejected him from the house, that his relationship with his wife and children had suffered, that he was unable to concentrate, that he felt insecure about his prospects for finding employment, and that he was embarrassed held legally insufficient).

Because the evidence is legally insufficient to establish severe emotional distress, we reverse the portion of the judgment that awards Willis $55,000 in damages from Gonzales and render judgment that she take nothing on her intentional infliction of emotional distress claim.

## WILLIS'S APPEAL

In addition to her intentional infliction of emotional distress and negligence claims, Willis also alleged a violation of the Texas Commission on Human Rights Act (TCHRA). Regarding this claim, the jury found that Benson failed to hire Willis because she is female and that Gonzales sexually harassed her. But the trial court granted a take-nothing judgment on this claim because Willis's administrative complaint was not timely filed. *See* TEX. LAB. CODE ANN. § 21.202(a); *Specialty Retailers, Inc. v. DeMoranville,* 933 S.W.2d 490, 492 (Tex.1996). The trial court also granted Benson's motion for directed verdict on Willis's negligence claims on the ground that those claims were preempted by the TCHRA. Willis argues that this ruling was erroneous. Benson argues that the finding of preemption was correct, or in the alternative, was harmless error.

### 1. Preemption

The TCHRA prohibits employment discrimination on a number of grounds, including sex. *See* TEX. LAB.CODE ANN. § 21.051 (Vernon 1996); *Perez v. Living Centers–Devcon, Inc.,* 963 S.W.2d 870, 872 (Tex.App.—San Antonio 1998, pet. denied). It sets forth a comprehensive administrative review system that a discrimination victim must follow before filing a civil action alleging violations of the TCHRA. *See Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 485–88 (Tex.1991).

In *Perez,* we addressed the question of "whether the Texas legislature intended for the TCHRA to preempt common law causes of action." 963 S.W.2d at 873. After examining the act's language, we stated:

> Notably, neither an intent to serve as an exclusive remedy, nor an intent to preclude common law causes of action, is contained within the stated purposes of the TCHRA. Additionally, the statute contains no provision that implies the TCHR's administrative review system precludes a lawsuit for common law causes of action.

*Id.* at 874 (citation omitted). We further noted that section 21.211 of the TCHRA implies that the legislature did not intend to preempt common law causes of action. *See id.* That section provides:

> A person who has initiated an action in a court of competent jurisdiction or who has an action pending before an administrative agency under other law or an order or ordinance of a political subdivision of this state based on an act that would be an unlawful employment practice under this chapter may not file a complaint under this subchapter for the same grievance.

TEX. LAB.CODE ANN. § 21.211. Focusing on this section, we stated:

> Rather than preclude other causes of action that might arise from an employment practice made unlawful by the TCHRA, this language implies that a plaintiff cannot have two bites at the apple. That is, a plaintiff cannot first sue a defendant-employer for a non-TCHRA cause of action for conduct arising from the same facts as employment discrimination and then pursue a claim of employment discrimination through the administrative review system established under the TCHRA.... This provision requires a plaintiff to pick a remedy and permits a plaintiff like Perez to pursue common law causes of action that arise from the same facts as sexual harassment.

*Perez*, 963 S.W.2d at 874. After examining the language of the TCHRA, including section 21.211, and its legislative history, we concluded that the TCHRA is not the exclusive state law remedy for conduct that violates its provisions. *See id.* at 872–75.

■ Based on *Perez*, Willis argues that the trial court erred by directing a verdict on her negligence causes of action. Benson responds that this case is distinguishable from *Perez* because unlike Perez, Willis attempted to pursue *both* a claim under the TCHRA and common law claims. As support for its argument, Benson focuses on our analysis of section 21.211, particu-

larly the statements that a plaintiff must "pick a remedy" and is not allowed "two bites at the apple."

The fact that Willis pursued an administrative remedy does not change the preemption analysis. Nothing in *Perez* suggests that our no-preemption holding was limited to the facts of that case. The language of section 21.211 was merely one of the reasons we cited for concluding that Perez's common law claims were not preempted. Moreover, the election of remedies provision in section 21.211 does not apply to this case because Willis did not initiate suit on her common law claims *before* pursuing her claim under the TCHRA.[1] By exhausting her administrative remedies, Willis acted consistently with the legislative intent underlying the TCHRA. *See Schroeder*, 813 S.W.2d at 486 (holding that the TCHRA's administrative process "clearly encourages compliance through voluntary resolution, conference, conciliation and persuasion—informal processes other than litigation").

Finally, Benson points out that three federal district court opinions, two of which are unpublished, have held that the TCHRA preempts common law causes of action. *See Cook v. Fidelity Investments*, 908 F.Supp. 438, 442 (N.D.Tex.1995); *Hardy v. Fleming Food Cos.*, No. H–94–3759, 1996 WL 145463, at *27 (S.D.Tex. March 21, 1996); *Bates v. Humana, Inc.*, No. SA–92–CA–432, 1993 WL 556416, at *11 (W.D.Tex. Oct. 12, 1993). Benson suggests that we should follow these decisions because our supreme court has held that federal decisions interpreting federal discrimination statutes may be instructive in construing the TCHRA. *See Specialty Retailers*, 933 S.W.2d at 492. The cases cited by Benson, however, do not interpret federal discrimination statutes; rather,

---

1. Because Willis did not recover on her claim under the TCHRA, the common law election of remedies rule and one-satisfaction rule are also inapplicable. *See Stewart Title Guar.Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex.1991) (one-satisfaction rule prevents plaintiff from obtaining more than one recovery for the same injury); *Green Oaks, Ltd. v. Cannan*, 749 S.W.2d 128, 131 (Tex.App.—San Antonio 1987) (sole purpose of election of remedies doctrine is to prevent double recovery for single wrong), *writ denied per curiam*, 758 S.W.2d 753 (Tex.1988).

they address the purely state-law question of whether the TCHRA preempts common law claims. Because their answer to this question is inconsistent with our own precedent, we decline to follow them.

The trial court erred by directing a verdict on Willis's negligence causes of action on the basis of preemption.

## 2. Absence of Underlying Tort

■ In its motion for rehearing, Benson asserts that even if the trial court's preemption ruling was erroneous, the granting of the directed verdict was harmless in light of our disposition of Gonzales's appeal. Benson argues that since Gonzales did not commit an actionable tort against Willis, it cannot be held liable for negligently hiring, retaining, training, or supervising Gonzales.[2] We agree.

Although we have not found a Texas case directly on point, courts in other jurisdictions have held that an employer cannot be held liable for negligently hiring an employee unless the employee committed an actionable tort. *See Hays v. Patton–Tully Transp. Co.,* 844 F.Supp. 1221, 1223 (W.D.Tenn.1993); *Mulhern v. City of Scottsdale,* 165 Ariz. 395, 799 P.2d 15, 18 (1990); *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116, 123–25 (1986); *Louis Marsch, Inc. v. Pekin Ins. Co.,* 140 Ill.App.3d 1079, 96 Ill.Dec. 386, 491 N.E.2d 432, 437 (1985).

■ This rule comports with the fundamental tort principle that a person is not liable for negligence, no matter how egregious, unless the negligence causes a legally compensable injury. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 30, at 165 (5th ed.1984). In the context of negligent hiring claims, if the employee did not commit an actionable tort, the plaintiff has not been injured in the eyes of the law; therefore, the employer's negligence has not caused a legally compensable injury.

This rule is also consistent with well-settled Texas precedent regarding negligent entrustment claims, which are akin to negligent hiring claims. *See Deerings West Nursing Ctr. v. Scott,* 787 S.W.2d 494, 495–96 (Tex.App.—El Paso 1990, writ denied). To prevail on a claim for negligent entrustment of a vehicle, the plaintiff must establish not only that the owner was negligent in entrusting the vehicle, but also that the driver's negligent operation of the vehicle proximately caused damage to the plaintiff. *See Schneider v. Esperanza Transmission Co.,* 744 S.W.2d 595, 596 (Tex.1987); *Fidelity & Guar. Ins. Underwriters v. McManus,* 633 S.W.2d 787, 790 (Tex.1982); *see also Rodgers v. McFarland,* 402 S.W.2d 208, 210 (Tex.Civ.App.—El Paso 1966, writ ref'd n.r.e.) ("Obviously, an owner who is negligent in entrusting his vehicle is not liable for such negligence until some wrong is committed by the one to whom it is entrusted."). Analogously, to prevail on a claim for negligent hiring, the plaintiff should be required to establish not only that the employer was negligent in hiring the employee, but also that the employee committed an actionable tort against her. When this rule is applied here, it is apparent that Willis's negligence claims must fail. Because Willis did not present legally sufficient evidence to establish that she suffered severe emotional distress, she failed to establish that Gonzales committed an actionable tort. Therefore, assuming that Benson was negligent in hiring, retaining, training, and supervising Gonzales, Willis suffered no compensable injury as a result of this negligence.

■ We also note that the jury's finding that Gonzales sexually harassed Willis cannot provide the basis for Willis's negligence claims. As one court has stated:

> Sexual harassment has never been a common law tort; as a cause of action, it is a statutory creation. A negligent su-

2. For purposes of this discussion, there is no relevant distinction among negligent hiring, retention, training, or supervision. We will refer to all these torts collectively as "negligent hiring."

pervision claim cannot be based solely upon an underlying claim of sexual harassment *per se,* because the effect would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law.

*Hays,* 844 F.Supp. at 1223 (citation omitted). Moreover, if we allowed a sexual harassment finding to supply the basis for recovery on a negligent hiring claim, the statutory procedures and limitations applicable to such claims would be rendered superfluous. *See, e.g.,* TEX. LAB.CODE ANN. § 21.201 (Vernon 1996) (requiring exhaustion of administrative remedies); *id.* § 21.2585 (limiting available damages).[3] Accordingly, negligent hiring will be a viable cause of action in a sexual harassment case only if the harassment encompasses misconduct that is independently actionable under the common law, such as battery or intentional infliction of emotional distress. *See Hays,* 844 F.Supp. at 1223.

 We must affirm a directed verdict if the record discloses a ground that establishes, as a matter of law, that the movant was entitled to judgment, even though the ground was not embodied in the motion for directed verdict. *See Granato v. Bravo,* 498 S.W.2d 499, 502 (Tex.Civ.App.—San Antonio 1973, no writ); *see also Texas Employers Ins. Ass'n v. Page,* 553 S.W.2d 98, 102 (Tex.1977); *Connell v. Connell,* 889 S.W.2d 534, 539 (Tex.App.—San Antonio 1994, writ denied). Because Willis failed to establish that Gonzales committed an actionable tort, her negligence claims are precluded as a matter of law. We therefore affirm the directed verdict on these claims.

ANGELINI, joined by DUNCAN, JJ.

KAREN ANGELINI, Justice, concurring in the judgment only.

I do not believe Gonzales's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965). I agree with all other aspects of the majority opinion and therefore concur in the judgment.

---

**3.** In this case, for example, Willis was precluded from recovering on her sexual harassment claim, in spite of the jury's favorable finding, because she did not timely file a complaint with the Texas Commission on Human Rights.