**REVERSE and RENDER; and Opinion Filed November 19, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-00034-CV

**JAMES LERMON, Appellant/Cross-Appellee**
**V.**
**MINYARD FOOD STORES, INC., AND RODNEY LEE, Appellees**

**On Appeal from the County Court at Law No. 1**
**Dallas County, Texas**
**Trial Court Cause No. CC-10-02955-A**

## MEMORANDUM OPINION

Before Justices O'Neill, Lang-Miers, and Evans
Opinion by Justice O'Neill

James Lermon sued Minyard Food Stores and Rodney Lee (collectively Minyard) for malicious prosecution, negligence, and gross negligence. A jury found in Lermon's favor on all claims and awarded Lermon $830,000 in actual damages and $115,000 in punitive damages on his malicious prosecution claim and $175,000 in actual damages and $1 million in punitive damages on his negligence and gross negligence claims. The trial court rendered judgment on Lermon's malicious prosecution claim.

In his appeal, Lermon contends the trial court erred in failing to enter judgment on the jury findings affording him the greatest recovery. In its cross-appeal, Minyard contends the evidence is both legally and factually insufficient to support Lermon's claims for malicious prosecution, negligence, and gross negligence. It also challenges the jury's award of actual and punitive damages. We conclude the evidence is legally insufficient to support the jury's verdict

on Lermon's claims. Accordingly, we reverse the trial court's judgment and render judgment that Lermon take nothing.

## Background

At 4:11 a.m. on September 4, 2006, $76,000 was stolen from the safe of a Carnival grocery store owned by Minyard. Surveillance videos taken at the store showed the thief entering and exiting the store as well as the actual theft. The thief, however, used an umbrella to shield his face from the camera's view. The thief had a key to the store and knew the store's alarm code and the combination of the safe. The thief was also able to quickly locate the alarm and the safe and then retrieve the cash deposit, suggesting the theft was an inside job. In the months prior to the theft, two similar thefts occurred at other stores owned by Minyard.

Minyard immediately reported the offense to Plano police. Detective Jeff Dalton investigated. Minyard also conducted its own internal investigation, led by its vice-president of loss prevention, Rodney Lee, who was assisted by loss prevention investigators Susan Caldwell and Bobby LaJuett. During the course of Minyard's investigation, Lee provided information to Detective Dalton and ultimately identified the thief as Lermon, who had recently retired from Minyard. A grand jury later indicted Lermon for the offense and the Collin County District Attorney's Office tried him for the offense. Lermon's first trial ended in a mistrial. The DA tried Lermon a second time, resulting in his acquittal. Lermon then brought this suit for malicious prosecution, negligence, and gross negligence against Minyard and Lee asserting they were responsible for the damages he suffered from the criminal prosecution.

To show Minyard and Lee maliciously prosecuted him, Lermon relied on certain information Lee gave to Detective Dalton, which Lermon asserts Lee knew was false. In particular, Lermon relies on a September 12, 2006 "Voluntary Statement" and a September 15, 2006 memo addressed to Detective Dalton.

–2–

In the September 12, 2006, "Voluntary Statement," Lee stated:

> Following an investigation of a stolen cash deposit at our Carnival Foodstore #129 on 9/4/06 we determined the suspect to be an ex-employee James Lermon. After reviewing video and still shots and visiting with Mr. Lermon on 9/8/06 it is clear he is the person in the pictures. (Additionally, Mr. Lermon misrepresented several aspects of information pertaining to his returning store keys upon his retirement 8/3/06) Mr. Lermon worked at this location as a "fill-in" Asst. Mgr. in 6/06 and had previously worked as an Asst. Mgr. prior as well. Mr. Lermon would have had the safe combination and alarm codes when he worked at this store in June. After reviewing all evidence/information I am convinced this is Mr. Lermon who committed this crime.

In the September 15, 2006 memo, Lee provided Detective Dalton a "Case Narrative" of the theft. In it, he included further details of his investigation. Lee stated that immediately after the theft, he and loss prevention investigators Caldwell and LaJuett were called to the store. He said after reviewing the surveillance video, the suspect immediately appeared "familiar" to them, but it was difficult to identify the suspect from the video. He said they compiled a list of all management that had access to the store's alarm code since it changed in April 2006, and then excluded all non-white individuals because the suspect in the video was clearly an older white male. They then requested a Fort Worth police officer to "clean-up" the video and provide still shots of the thief. They were able to obtain clearer images, but Minyard sent the hard drive to a private company in an effort to obtain even clearer shots.[1]

Lee further stated that on September 6, 2006 (two days after the theft), the Carnival store received a set of manager's keys for that store in an interoffice envelope. The handwriting on the envelope was identified as Lermon's. Lee stated Lermon had retired from Minyard on August 3, 2006, but would have had access to both the store's safe combination and the security alarm code because he had worked at the store since the alarm code changed.

---

[1] The company was unable to obtain better images.

Lee stated he went to Lermon's home and asked him about the keys. Lermon confirmed the handwriting on the interoffice envelope was his. Lermon told Lee he had returned the keys to a Sack 'N Save (a Minyard owned store) on September 2, 2006 (two days prior to the theft) when he went to that store to pick up a prescription. Lee said he confirmed Lermon had in fact returned the keys on September 2, giving them to a cashier. However, Lermon did not pick up a prescription on that date and the last time he had picked up a prescription from that location was August 19, 2006.

Lee also stated that after he spoke to Lermon, he "took note of his shaggy white beard" and "longer than normal" white hair, which "confirmed what we saw in the video."[2] Lee concluded his memo by stating all known evidence, employee statements, photographs, and videos had been turned over to Detective Dalton.

About a month after Lee's memo and voluntary statement, Detective Dalton prepared a probable cause affidavit requesting a warrant for Lermon's arrest. In his affidavit, Dalton states that he "has good reason to believe and does believe" that Lermon committed the theft. With respect to the thief's identity, Dalton stated James Luna, the manager that opened the store the morning after the theft, told him that he had watched the surveillance video with loss prevention investigators and that the thief "looked like" Lermon to him. Dalton also said Lee gave him a copy of the store's surveillance video. Detective Dalton watched the video and said it showed a white male that appeared to have white hair and a beard.

Detective Dalton said that although the man used an umbrella to shield his identity, still pictures obtained from the video captured the back and the side of the thief's head. Finally, Detective Dalton stated that Lee had told him that he had known Lermon for twenty years, Lee

---

[2] Lee had previously told Caldwell that it looked like the thief might be wearing a hair net and beard net.

reviewed the surveillance video and still photographs taken from the video, and the man on the video was Lermon.

A magistrate issued a warrant for Lermon's arrest based on Detective Dalton's affidavit, and Dalton filed the case with the DA's office. When he did so, Detective Dalton gave the DA's office his "summary" of the charges. In the summary, Dalton states, among other things, that Lee "believed" Lermon had used an "old key" that he had not returned upon retirement to unlock the door of the store.

William Coleman Sylvan, the lead prosecutor in Lermon's second trial, testified for Minyard. According to Sylvan, he had a "good" case against Lermon and it "was a case [he] believed in and believed needed to be prosecuted." Sylvan also testified that at no time during his prosecution of the case did he believe Minyard was acting maliciously toward Lermon, nor did he believe Minyard was trying to cause Lermon to be prosecuted. Further, Sylvan testified that before a prosecutor takes a case to trial, he has to evaluate it on his own to determine whether it has merit. He said if he had the sense that Minyard was trying to falsely prosecute Lermon, he would not have gone forward with the case.

On cross-examination, Sylvan said he knew a "significant portion" of information obtained by Detective Dalton about the theft came from Lee. Sylvan also acknowledged that the statement in Detective Dalton's summary − that Lee believed Lermon used an old key to enter the store that he failed to return upon retirement − would have been a "factor" in deciding whether to prosecute. However, Sylvan also testified that Lee had told him before Lermon's second trial that Lermon had returned the keys before the theft. Sylvan could not remember exactly what Lee said about the timing of the key's return, but he knew the keys had been returned. Sylvan also testified he personally reviewed the videotape of the crime. On re-direct,

Sylvan testified he still would have felt he had a good case even if he was not presented information about the key.

Because the issues raised in Minyard's cross-appeal are dispositive, we address them at the outset. In its first issue, Minyard asserts there is no evidence to support Lermon's claim for malicious prosecution because the decision to prosecute Lermon was made by law enforcement officials and Lermon did not otherwise show Minyard or Lee initiated or procured the prosecution. We agree.

Malicious Prosecution

The tort of malicious prosecution creates a unique tension between important competing societal concerns. *See Browning-Ferris Indus. v. Lieck*, 881 S.W.2d 288, 290 (Tex. 1994). Specifically, a plaintiff's right to recover damages for being subjected to unjustified criminal proceedings must sometimes yield to society's greater interest in encouraging citizens to report crimes, real or perceived. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 (Tex. 2006). Thus, a plaintiff must prove not only that the defendant commenced criminal proceedings against him and he is innocent of the crime charged, but also that the defendant lacked probable cause and harbored malice toward him. *Id.* These latter elements guard against a jury's natural inclination to punish those who, through error but not malevolence, commence criminal proceedings against a person who is ultimately exonerated. *Id.*

To prove causation, a plaintiff must specifically show the defendant "initiated or procured" the criminal prosecution. *See Lieck*, 881 S.W.2d at 292–93; *Dangerfield v. Ormsby*, 264 S.W.3d 904, 910 (Tex. App.—Fort Worth 2008, no pet.). A defendant "initiates" a prosecution when it files "formal charges" against the plaintiff. *See Lieck*, 881 S.W.2d at 293; *Dangerfield*, 264 S.W.3d at 910. A person "procures" a criminal prosecution "if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have

occurred." *Lieck*, 881 S.W.2d at 292. Procurement generally requires that a person's actions be both a "necessary and a sufficient cause of the criminal prosecution." *Id.*

Generally, a person cannot be held liable for malicious prosecution if the decision whether to prosecute is left to the discretion of law enforcement officials. *King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003) (per curiam). An exception exists if the person provides information to those officials which he knows is false. *Id.* In such cases, the plaintiff must further prove the false information caused the criminal prosecution by proving the decision to prosecute would not have been made but for the false information supplied by the defendant. *Id.*

Actions for malicious prosecution are not favored in the law and therefore we strictly adhere to the tort's carefully defined elements. *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas 2000, no pet.) Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct. *Lieck*, 881 S.W.2d at 291.

Standard of Review

An appellant attacking the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Affordable Power, L.P. v. Buckeye Ventures, Inc.*, 347 S.W.3d 825, 830 (Tex. App.—Dallas 2011, no pet.). A "no evidence" point must be sustained when the record discloses (1) a complete absence of evidence of a vital fact, (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id*. at 822. Evidence is legally sufficient if it rises to a level that would enable a reasonable and fair-minded jury to make the finding. *Id*. at 810. In making this determination, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. *Id*. at 812. We do not consider the evidence "in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with other evidence." *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008).

Evidence that is "so weak as to do no more than create a mere surmise or suspicion" of a fact is not legally sufficient evidence that the fact exists. *Kroger Tex. Ltd. P'ship*, 216 S.W.3d at 793 (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)). If a claim is supported by only meager circumstantial evidence, the evidence does not rise above a scintilla if jurors would have to guess as to whether a vital fact exists. *City of Keller*, 168 S.W.3d at 813. When circumstances are equally consistent with either of two facts, neither fact can be inferred. *Id*. Additionally, an inference stacked only on other inferences is not legally sufficient evidence. *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (per curiam); *Sears & Roebuck Co. v. AIG Annuity Ins. Co.*, 270 S.W.3d 632, 637 (Tex. App.—Dallas 2008, pet. denied).

Application

In this issue, Minyard asserts Lermon failed to show either it or Lee initiated or procured the prosecution. Lermon responds the evidence is sufficient to show Lee both initiated and procured the prosecution. Lermon first asserts Lee "initiated" the prosecution when he gave Detective Dalton a "Voluntary Statement" identifying Lermon as the thief with the "hope" that Detective Dalton would move forward to have Lermon arrested and prosecuted. To show such a statement can constitute a "formal charge," Lermon relies on this Court's opinion in *Kroger v.*

*Suberu*, 113 S.W.3d 588, 597 (Tex. App.—Dallas 2003), *rev'd on other grounds*, 216 S.W.3d 788 (Tex. 2006).

In *Kroger*, a Kroger employee stopped the plaintiff for shoplifting. *Id.* at 594−95. The plaintiff was taken to an office and Kroger contacted police. *Id.* at 595. When police arrived, the plaintiff was told she had been accused of shoplifting and she was immediately arrested and taken to jail. *Id.* To show Kroger "initiated" the prosecution, the plaintiff relied on evidence that the Kroger store manager had told police on their arrival that Kroger "wanted to prosecute" and that the manager signed "the report or whatever they had [him] sign" on behalf of Kroger. *Id.* at 597. We concluded the jury could have determined from that evidence that Kroger had "filed a formal charge" against the plaintiff. [3] *Id.*

In this case, the record before us contains the "Voluntary Statement" that Lermon asserts was used to initiate his prosecution. The witness statement is not a "formal charge" nor did it actually operate to initiate the criminal prosecution. Instead, the record shows Detective Dalton initiated the prosecution when he "formally charged" Lermon by presenting his own probable cause affidavit to a magistrate. *See* Restatement (Second) of Torts § 653 cmt. c (1977) ("Criminal proceedings are initiated by making a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused."); *see also Lieck*, 881 S.W.2d at 292-93. In reviewing a sufficiency complaint, we cannot disregard undisputed evidence that supports only one conclusion. *See City of Keller*, 168 S.W.3d at 814.

Minyard next asserts there is no evidence that it or Lee "procured" Lermon's prosecution because the undisputed evidence shows the decisions to arrest and prosecute Lermon were made

---

[3] We further concluded that, even if the plaintiff failed to show Kroger initiated the prosecution, there was sufficient evidence that it procured the prosecution. *See Kroger*, 113 S.W.3d at 597.

by law enforcement officials. *King*, 126 S.W.3d at 76. Here, unlike many malicious prosecution cases, it is undisputed Minyard was the victim of a felony theft. Detective Dalton investigated that theft for Plano police, and ultimately filed an affidavit in which he swore that he believed and had good reason to believe that Lermon committed the crime. *See* TEX. CODE CRIM. PRO. 2.13(a)(b)(1) (West 2005) (peace officers have a duty to preserve the peace and to prevent and suppress crime). The DA's office also investigated the offense and twice made the decision to pursue criminal charges against Lermon. *See* TEX. CODE CRIM. PRO. 2.01 (West 2005) (the primary duty of prosecuting attorneys is not to convict, but to see that justice is done).

Lermon nevertheless asserts he presented sufficient evidence that Dalton and the prosecutors based their decisions to prosecute on false information provided by Lee. First, he asserts their decisions were based on Lee's false identification of Lermon as the thief. An honest mistake in identifying a suspect is insufficient to hold the reporting party responsible in damages. *Cf. Schnaufer v. Price*, 124 S.W.2d 940, 942 (Tex. Civ. App.—Waco 1939, writ ref'd) (false imprisonment case); *see also McHenry v. Tom Thumb Page Drug Stores*, 696 S.W.2d 664, 665 (Tex. App.—Dallas 1985, writ dism'd); *Yianitisas v. Mercantile Nat'l Bank at Dallas*, 410 S.W.2d 848, 851 (Tex. Civ. App.—Dallas 1967, no writ). But a person may be held liable if he willfully identifies the wrong person as the criminal for the purpose of having him arrested and prosecuted. *See Schnaufer*, 124 S.W.2d at 942. According to Lermon, Lee did just that, by identifying him as the thief, knowing he was innocent.[4]

To show Lee identified Lermon knowing he was innocent, Lermon asserts the surveillance video showing the thief − when compared to photographs taken of him at the same location – establishes Lee could not possibly have honestly believed Lermon was the thief.

---

[4] He asserts Lee's motive for doing so was to "save his job" by solving the three thefts that occurred "on his watch" and to try to obtain restitution for Minyard from Lermon. The only evidence he directs us to support these motives is that the thefts occurred and that Lee made inquiries to prosecutors about the possibility of obtaining restitution for Minyard. This evidence is entirely, if not more, consistent with an honest belief that Lermon was the thief.

Specifically, he asserts the thief did not "look like" him because he wears glasses and is tall, but the thief was not wearing glasses and was "a full head shorter."

After reviewing the video and the photographs, we cannot agree they constitute any evidence that Lee *knew* it was not Lermon on the video. First, evidence the thief was not wearing glasses does not establish the thief did not "look like" Lermon or otherwise constitute any evidence that Lee must have known the person on the tape was not Lermon.[5] Second, the surveillance video and photographic evidence do not depict a height discrepancy so dramatic that would allow a jury to reasonably find (1) Lee would have been able to perceive the discrepancy from reviewing the video, (2) Lee did in fact perceive the discrepancy, and (3) cognizant of the discrepancy, Lee nevertheless identified Lermon to Detective Dalton anyway. Indeed, even Lermon's own brother-in-law, when asked to identify the differences in appearance between the thief and Lermon, responded "maybe some height, maybe some weight." Lermon himself − knowing Lee had identified him − testified that that he was not aware of any "false" information Lee gave authorities. Further, Detective Dalton and the prosecutors had the video before them and could determine for themselves whether Lermon's appearance was consistent with the thief's.

Lermon also contends Lee's identification constituted "false information" because Lee claimed to be certain. Lermon asserts the jury could have inferred Lee was not merely mistaken, but was lying, because the tape showed any certainty would have been impossible. Even if we could agree that a witness's level of certainty in identifying a suspect could constitute false "information," the record shows Lee told Detective Dalton he could not make a positive identification on his initial review of the videotape. Lee's subsequent positive identification was

---

[5] Not only can glasses be easily taken on and off, a person's need for glasses can change over time. Indeed, by the time of trial, Lermon himself no longer required glasses, having had cataract surgery.

based on what he had initially perceived about the thief's stature, walk, and gait, in addition to his later review of still shots and his discovery that Lermon had grown his hair and a beard since his retirement. Further, Detective Dalton and prosecutors could determine for themselves whether they believed a positive identification was possible from the video. We conclude evidence of Lee's positive identification is legally insufficient to show Dalton or prosecutors based their discretionary decisions to prosecute Lermon on information Lee provided and that Lee knew was false.

Lermon also asserts Lee gave Detective Dalton false information when he stated in his "Voluntary Statement" that Lermon misrepresented "several aspects" about his return of the keys to Minyard. To show this statement was both false and Lee knew it was false, Lermon relies on Lee's testimony at trial that the only misrepresentation Lee could remember was Lermon's claim that he had returned the keys to the store on the same date he picked up a prescription. According to Lermon, because Lee could remember only a single misrepresentation, his testimony shows his prior claim that there were "several" was knowingly false. We cannot agree Lee's testimony supports such an inference.[6] Moreover, Lermon has wholly failed to show that but for Lee's vague allegation regarding Lermon's return of the keys, either Detective Dalton or the district attorney would not have made the decision to prosecute Lermon. *King*, 126 S.W.3d at 78–79.

Lermon also contends he presented evidence Lee gave Detective Dalton information he knew was false when Lee told Detective Dalton Lermon had a key to the store at the time of the theft, when Lee knew Lermon had returned the key. To show Lee gave Dalton this false

---

[6] We note the record shows that Lee obtained his information regarding Lermon's return of the keys from Lermon himself and from the cashier, April Beard. Lermon also had failing memories concerning his conversation with Lee about the keys and could not remember telling Lee he returned the keys on a specific date, but vaguely remembered saying something about returning the keys at the same time he picked up a prescription from the Sack 'N Save. Lermon's brother-in-law, who worked at the same Sack 'N Save, testified Beard told him she had mistakenly told Lee that Lermon returned the keys on September 2, 2006 instead of August 19, 2006. Although both dates were prior to the theft, the focus on the date was apparently to show Lermon returned the keys at his first convenience after he retired and to show it was not suspicious that the keys arrived at the store two days after the theft.

information, Lermon relies on the summary Detective Dalton gave to the district attorney in which Dalton states that Lee believed Lermon used an "old key" to unlock the door of the business, which he did not return upon retiring. But in Lee's prior September 15, 2006 memo to Detective Dalton, Lee clearly informed Dalton that Lermon returned his keys to the store before the theft. Further, Lermon has again failed to show that but for this information, either Detective Dalton or the district attorney would not have made the decision to prosecute Lermon. *King*, 126 S.W.3d at 78−79 (testimony from investigative officer that false information "could possibly" have influenced his investigation is insufficient to show the decision to prosecute would not have been made but for the false information). Indeed, Sylvan testified he knew before Lermon's second trial that Lermon had returned the keys before the theft. Yet, he proceeded with the prosecution anyway.

Finally, Lermon contends there is evidence Lee procured the prosecution by "failing to disclose" material facts. To support his contention that a failure to disclose information can support a malicious prosecution claim, Lermon relies on dicta in the Supreme Court's opinion in *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 519 (Tex. 1997). In that case, the Supreme Court stated "failing to fully and fairly disclose all material information and knowingly providing false information to the prosecutor are *relevant* to the malice and causation elements of a malicious prosecution claim but have no bearing on probable cause." *Richey*, 952 S.W.2d at 519 (emphasis added); *but see Wal-Mart Stores, Inc. v. Rodriquez*, 92 S.W.3d 502, 510 (Tex. 2002) (evidence of a failure to disclose cannot support claim for false imprisonment because a plaintiff must prove defendant knowingly provided false information).

Assuming a "knowing failure" to disclose could support a claim for malicious prosecution, the jury in this case was charged, without objection, that it was required to find Lee provided information that he knew was false, not that he failed to disclose information. We must

–13–

therefore measure the sufficiency of the evidence by the charge as given. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002); *Noell v. City of Carrollton*, 431 S.W.3d 682, 709 (Tex. App.—Dallas 2014, pet. ref'd). As a consequence, evidence Lee failed to disclose information to Dalton cannot support the jury's verdict. *See Wal-Mart Stores, Inc.,* 92 S.W.3d at 510 (failing to make a full and fair disclosure is not the equivalent of knowingly providing false information).

Moreover, Lermon failed to show Lee knowingly failed to disclose material information or that Dalton would not have made the decision to prosecute had he been aware of any information that was not actually disclosed. According to Lermon, Lee failed to disclose that: (1) Lermon was "much taller" than the perpetrator and wore glasses, (2) Lee had initially believed two other employees had provided the store keys and codes to the thief, (3) Lee did not question Lermon about the theft or determine whether he had an alibi, (4) the last time Lermon had worked at the store prior to June 2006 was over ten years before the theft, (5) Minyard did not keep track of who had access to keys to the store, and (6) Lermon returned the keys to the store before the theft.

To show this information was not disclosed in the first instance, Lermon appears to rely on Lee's failure to include the information in his Voluntary Statement and the memo containing Lee's "Case Narrative" that followed. We first note that although Lermon's claim required him to show the reason Dalton decided to prosecute and Dalton investigated the offense for two months, Lermon did not call Dalton as a witness or otherwise attempt to show what information Dalton had acquired before he obtained the warrant. The record does show however that Dalton was given photographs of Lermon wearing glasses. The record also shows that Lee told Dalton two other employees were suspected in the theft. Lee also told Dalton that Lermon had returned the keys to the store before the theft. Even if we could conclude Lermon presented sufficient

–14–

proof that Lee failed to disclose information, we cannot agree the evidence supports a reasonable inference that Dalton would not have prosecuted Lermon but for Lee's failure to disclose.

We conclude there is no evidence to show Minyard or Lee initiated or procured Lermon's criminal prosecution and therefore there is no evidence to support Lermon's malicious prosecution claim.

Negligent Hiring, Retention, Training, and Supervision

Minyard also asserts the evidence is legally insufficient to support Lermon's direct negligence claim against it. Lermon sued Minyard asserting it was negligent in hiring, retaining, training, and supervising Lee. To support these claims, Lermon relied on evidence that Minyard did not adequately train Lee to perform the duties he was performing when he investigated the theft and did not adequately supervise Lee during his investigation.[7]

To sustain a cause of action for negligence it is necessary to produce evidence of a duty, a breach of that duty, proximate cause and damages. *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex. 1984). Here, the duty Minyard owed Lermon was to act as a reasonably prudent grocery store chain would act under the same or similar circumstances regarding any reasonably foreseeable risk. *See id; see also Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 652 (Tex. App.—Dallas 2002, pet. denied); *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 902 (Tex. App.—Fort Worth 2007), *rev'd on other grounds*, 306 S.W.3d 230 (Tex. 2010).

---

[7] The Supreme Court has yet to rule definitively on the "existence, elements, and scope of [causes of action for negligent retention and supervision] and related torts such as negligent training and hiring." *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010). The Supreme Court has, however, indicated that to recover, a plaintiff must show "more than just negligent hiring practices;" he must also present evidence of harm caused by the employee's misconduct." *Wansey v. Hole*, 379 S.W.3d 246, 247 (Tex. 2012). In doing so, it cited opinions from our sister courts holding a plaintiff must prove, in addition to the employer's negligence, an actionable tort by the employee. *See id.* (citing *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 384 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex. App.—San Antonio 1999, no pet.), *overruled in part on other grounds by Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447–48 (Tex. 2004); *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no writ). Here, the jury charge did not require the jury to first find Lee committed a tort before finding Minyard negligent. Although Minyard complains the trial court erred in submitting a separate "damages" question based on Minyard's negligence, it does not complain that the charge did not predicate the question regarding Minyard's negligence on a finding of Lee's tortious conduct. Because we conclude there is no evidence of negligence, we need not consider Minyard's complaint regarding the separate damages question.

Negligent hiring, retention, supervision, and training claims focus on the employer's own negligence, not the negligence of the employee. *See Leake v. Half Price Books, Records, Magazines, Inc.*, 918 S.W.2d 559, 563 (Tex. App.—Dallas 1996, no writ). An employer can be liable for negligence if its failure to use due care in hiring, retaining, training, or supervising an employee creates an unreasonable risk of harm to others. *See Leake,* 918 S.W.2d at 563; *Martinez v. Hays Const., Inc.*, 355 S.W.3d 170, 180 (Tex. App.—Houston [1st Dist.] 2011, no pet.). To support a claim for negligent hiring or retention, a plaintiff must prove the employer hired or retained an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit. *Ogg v Dillard's, Inc.*, 239 S.W.3d 409, 420 (Tex. App.—Dallas 2007, pet. denied). To support a claim for negligent training and supervision, a plaintiff must prove that a reasonably prudent employer would have provided training and supervision beyond that which was given and the failure to do so caused his injuries. *See Patino v. Complete Tire, Inc*., 158 S.W.3d 655, 661 (Tex. App.—Dallas 2005, pet. denied); *Dangerfield,* 264 S.W.3d at 912; *see Allsup's Convenience Stores, Inc. v. Warren*, 934 S.W.2d 433, 437 (Tex. App.—Amarillo 1996, writ denied).

On appeal, Minyard asserts Lermon failed to present any evidence of a standard of care or that it breached any such standard of care. Minyard specifically asserts Lermon failed to show it did not act as a reasonably prudent grocery store chain would have under the same or similar circumstances. Lermon responds he was not required to present any expert testimony or "other testimony" to establish a standard of care because the jury was charged on the "ordinary care" standard.

Regardless of whether Lermon had to present express testimony on the standard of care, Lermon had the burden to present sufficient evidence that Minyard did not use the degree of care a grocery store chain owner of "ordinary prudence" would use "under the same or similar

circumstances." *Cf. Jackson v. Axelrad*, 221 S.W.3d 650, 656 (Tex. 2007) (ordinary care standard requires jury to consider defendant's circumstances and superior skills); *Townsel v. Dadash, Inc.*, No. 05-10-01482-CV, 2012 WL 1403246, at * 3 (Tex. App.—Dallas April 24, 2012, no pet.); *TXI Transp. Co.,* 224 S.W.3d at 902. We conclude he failed to do so.

The only evidence in the record concerning Lee's qualifications and training came from Lee. He testified that he started working for Minyard in 1975 packing groceries and soon began doing other jobs inside the store. Later, he worked in the corporate offices in human resources. In 1987 or 1988, Lee was transferred to loss prevention. Lee had no "formal education" in law enforcement and was never given any "formal training" in investigation techniques. Lee said he was, however, given on-the-job training in loss prevention. Specifically, when Lee was first transferred to loss prevention, he began by sitting through investigations with a loss prevention manager. Lee later conducted his own investigations under the supervision of a manager. After four or five years, Lee became a loss prevention manager himself. Lee was ultimately promoted to vice-president of loss prevention, the position he held when he made the accusations against Lermon.

At that time, Lee's supervisor was Alan Vaughn, Minyard's senior vice-president of risk management. Lee said Vaughn did not conduct any interviews, take any photographs, or otherwise have any "hands-on" involvement in the investigation of the theft. Lee testified that Vaughn was, however, involved on a day-to-day basis overseeing what Lee was doing. Lee did not, however, provide any written reports to higher management during his investigation.

According to Lermon, the jury could have found Minyard did not exercise ordinary care in hiring, retaining, training, or supervising Lee because Lee had no "formal" training or education in "law enforcement" or "investigation techniques." Lermon's claim is premised on his contention that some specialized training or skill was necessary to give Lee the expertise

–17–

necessary to perform his job duties. Lermon, however, has failed to show what kind of "formal" training a business exercising ordinary prudence would provide its loss prevention investigators. For example, there is no evidence showing what kind of "formal" training is available or commonly used in the industry or to show how any such "formal" training would have been superior to on-the-job training or would have reduced the risk of harm to third parties.

We also conclude Lermon has failed to present any evidence that Minyard failed to use ordinary care in supervising Lee. According to Lermon, the jury could have found Minyard was negligent because Lee's supervisor did not have any "hands on" involvement in the investigation, and Lee did not give written reports to management during the investigation. Lee, however, had nearly twenty years of experience in loss-prevention and was himself a vice-president and supervisor. Lermon has directed us to no evidence showing Minyard had any prior notice that Lee was unfit or incompetent to perform his job duties or should have been more closely supervised. We conclude Lermon failed to present any evidence a reasonably prudent employer would have provided training or supervision to Lee beyond that which Minyard provided. *See Patino*, 158 S.W.3d at 661; *Dangerfield,* 264 S.W.3d 91. We further conclude Lermon failed to present any evidence that a reasonably prudent employer would have been aware Lee was unfit or unqualified to perform his job duties. Thus, Lermon has failed to show Minyard was negligent. As a consequence, he has also failed to show gross negligence. *See Seaway Prods. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 659 (Tex. App.—Fort Worth 2004, no pet.); *Ballesteros v. Jones*, 985 S.W.2d 485, 500 (Tex. App.—San Antonio 1998, pet. denied).

Having concluded there is no evidence to support Lermon's claims, we do not reach the issues presented in Lermon's appeal, all of which concern damages. Minyard has, however, presented an issue requesting this Court to assess sanctions against Lermon under Texas Rule of Appellate Procedure 45. It asserts the issues raised in Lermon's appeal were frivolous and that

Lermon could not have believed those issues would result in a rendition of a greater award of punitive damages in his favor. It further complains that Lermon's purpose in bringing the appeal, which he filed before the trial court had ruled on Minyard's motion for new trial and well before the notice of appeal was due, was to obtain the strategic advantage of being designated as the "appellant."

Under rule 45, after considering the record, briefs, or other papers filed in this Court, we may award a prevailing party damages if we objectively determine that an appeal is frivolous. TEX. R. APP. P. 45; *Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). An appeal is frivolous when the record, viewed from the perspective of the advocate, does not provide reasonable grounds for the advocate to believe that the case could be reversed. *Smith*, 51 S.W.3d at 381. The decision to grant appellate sanctions is a matter of discretion that an appellate court exercises with prudence and caution and only after careful deliberation. *Id.* Because our disposition of this case makes it unnecessary to review the merits of Lermon's appeal or consider the trial court's award of punitive damages, we will not consider whether the appeal was frivolous solely for the purposes of assessing sanctions.

Because Lermon failed to present legally sufficient evidence to support his causes of action, we reverse the trial court's judgment and render judgment that he take nothing on his claims.

/Michael J. O'Neill/
_____
MICHAEL J. O'NEILL
JUSTICE

130034F.P05

–19–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JAMES LERMON, Appellant

No. 05-13-00034-CV        V.

MINYARD FOOD STORES, INC., and
RODNEY LEE, Appellees

On Appeal from the County Court at Law
No. 1, Dallas County, Texas
Trial Court Cause No. CC-10-02955-A.
Opinion delivered by Justice O'Neill.
Justices Lang-Miers and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellant/cross-appellee James Lermon take nothing.

It is **ORDERED** that appellees/cross-appellants Minyard Food Stores, Inc. and Rodney Lee recover their costs of this appeal from James Lermon.

Judgment entered this 19th day of November, 2014.